## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

TRINA RUSS,                                    Case No. 19-CV-2719 (DSD/JFD)

         Plaintiff,

v.

ECKLUND LOGISTICS, INC.,                **ORDER ON PLAINTIFF'S MOTIONS**
KLE EQUIPMENT LEASING, LLC,             **TO AMEND HER COMPLAINT TO**
SHANE THOMAS MICHAELS, and              **ADD CLAIMS FOR PUNITIVE**
XPO LOGISTICS, LLC,                     **DAMAGES**

         Defendants.

This matter is before the Court on Plaintiff's Motions for Leave to File a Third Amended Complaint to Add a Claim for Punitive Damages Against Defendants Ecklund Logistics, Inc. ("Pl.'s Ecklund Mot.," Dkt. No. 134), and XPO Logistics, LLC ("Pl.'s XPO Mot.," Dkt. No. 138) (collectively "Motions to Amend").

Plaintiff Trina Russ brought this wrongful death action against four Defendants for their alleged involvement in a fatal vehicle collision in June of 2019 in which Ms. Russ's husband ("Mr. Russ" or "Decedent") died. This Court held a motions hearing on Tuesday, January 18, 2022, at which Jake Jagdfeld and Mike Johnson appeared for Plaintiff; Mike Moline and Peter Culp appeared for Defendants Ecklund Logistics, Inc. ("Ecklund Logistics"), KLE Equipment Leasing, LLC ("KLE Equipment"), and Shane Thomas Michaels ("Mr. Michaels"); and Gordon Hansmeier appeared for Defendant XPO Logistics, LLC ("XPO Logistics"). (Hr'g Mins., Dkt. No. 177.) For the reasons set forth below, the Court denies Plaintiff's Motion as to XPO Logistics, but grants Plaintiff's

Motion as to Ecklund Logistics. The Court also *sua sponte* orders Plaintiff to, within 14 days, file her Third Amended Complaint and allege with specificity the citizenship of each party at the time of this action's commencement, in order that the Court may adequately assess whether it has subject matter jurisdiction over this case. That will depend upon whether complete diversity exists between Plaintiff and all Defendants.

## I.   PLAINTIFF'S MOTIONS TO AMEND

### A.   Background

The Court will first review the facts alleged, procedural posture, and the parties' general arguments for and against Plaintiff's Motions to Amend.

#### 1.   The Proposed Third Amended Complaint's Alleged Facts

The following facts are taken from the proposed Third Amended Complaint ("TAC," Dkt. No. 165-2) which the Court takes as true for purposes of these Motions. Plaintiff alleges that on June 13, 2019, Defendant Michaels struck Decedent Andrew Russ's car from behind on an interstate highway while driving a semi-trailer registered to Defendant Ecklund Logistics and owned by KLE Equipment, and while hauling a freight load that XPO Logistics had subcontracted Ecklund to carry. (*Id.* ¶¶ 19–20.) Plaintiff alleges that his, in turn, caused a chain-reaction crash involving three other vehicles besides Mr. Russ's. (*Id.*) First responders could not revive Mr. Russ, and hospital staff pronounced him dead shortly afterwards. (*Id.* ¶¶ 24–27.)

Four Defendants are named concerning the collision resulting in Mr. Russ's death. Plaintiff alleges that Defendant XPO Logistics is a transportation logistics company that hired Defendant Ecklund Logistics, a freight hauling company, to transport a load of freight

on June 12 from Waupaca, Wisconsin to Thief River Falls, Minnesota. (*Id.* ¶¶ 6–9, 35.) According to Plaintiff's allegations, Defendant KLE Equipment owned the semi-trailer in question, which it had leased to Ecklund Logistics. (*Id.* ¶ 11.) Plaintiff also alleges that Ecklund Logistics hired Defendant Shane Thomas Michaels as its employee and, on his second day on the job, tasked him with delivering a load of freight in the semi-trailer involved in the collision. (*Id.* ¶¶ 12–13.) Plaintiff's Motions concern XPO Logistics and Ecklund Logistics; Plaintiff does not seek leave to amend to add a claim for punitive damages against either KLE Equipment Leasing, LLC, or Mr. Michaels. The Court will therefore focus on the proposed TAC's allegations as to Defendants XPO Logistics and Ecklund Logistics, taking them as true for the purposes of deciding these Motions.

Plaintiff alleges that XPO Logistics failed to investigate and ensure that Ecklund Logistics was a safe and professional company with safe and professional drivers. (*Id.* ¶ 101.) Had XPO Logistics investigated Ecklund Logistics, Plaintiff alleges that it would have found various red flags about Ecklund, including its history of insurance claims showing that it had caused many other fatal collisions, its repeated hours of service violations, and past judgments and liens against it. (*Id.* ¶¶ 101–20.)

Plaintiff alleges that Ecklund Logistics knew or should have known that Mr. Michaels's employment history and criminal record raised red flags, including that he had been fired for suspension of his safety clearance, failed an annual safety check, once allowed his semi-trailer to roll away, had been convicted of a felony and two misdemeanors, and had been cited for various vehicle-related violations. (*Id.* ¶¶ 78–81, 84.) Despite this, Plaintiff alleges that Ecklund Logistics hired Mr. Michaels, a decision that led

directly to the collision at issue in this action. (*Id.* ¶¶ 86–87.) According to the allegations, Mr. Michaels's social media posts provided further evidence of his unprofessionalism and poor judgment. (*Id.* ¶ 88.) The proposed TAC details posts depicting crashed semi-trailers and jokes about drivers' failures to lawfully log service hours. (*Id.* ¶¶ 88–89, 92, 95.) Although Plaintiff does not specifically allege in the proposed TAC that Ecklund Logistics—or XPO Logistics by extension—knew or should have known about Mr. Michaels's Facebook posts, XPO and Ecklund take these allegations as an effort by Plaintiff to create that inference (*see, e.g.,* Pl.'s Mem. Supp. Ecklund Mot. at 7–8; Def. Ecklund Logistics's Mem. Opp'n at 25–27).

In the days leading up to the collision, Plaintiff alleges that Ecklund Logistics directed Mr. Michaels to haul a load of freight from Waupaca, Wisconsin to Thief River Falls, Minnesota—a trip estimated to take approximately 8 hours and 45 minutes of driving time under normal traffic and conditions—and to deliver it by between 8:00 and 9:00 a.m. on June 13, 2019.[1] (Pl.'s Ex. B ¶¶ 40, 45(d), 57; *see also* Pl.'s Ex. F at 2, Dkt. No. 95-1; Pl.'s Ex. K at 2, Dkt. No. 95-1.) Plaintiff alleges that XPO Logistics and Ecklund Logistics created the context in which Mr. Michaels felt "under pressure to drive unsafely and in violation of the Federal Motor Carrier Safety Regulations ("FMCSRs")[2] because of the

---

[1] The Court notes that there are different accounts of Mr. Michaels's precise delivery deadline, with some allegations and exhibits stating that the deadline was 8:00 a.m., and others stating that it was between 8:00 and 9:00 a.m. (*See, e.g.,* Pl.'s Ex. B ¶¶ 40, 45(d), 57; Pl.'s Ex. F at 2; Pl.'s Ex. K at 2.) These discrepancies do not materially change the Court's analysis of these Motions.

[2] The FMCSRs are regulations issues by the United States Department of Transportation's Federal Motor Carrier Safety Administration ("FMCSA"), whose mission "is to reduce crashes, injuries and fatalities involving large trucks and buses," and they are codified at

delivery timeline [they] had set for him." (*Id.* ¶ 77.) According to Plaintiff, the day before the collision, the semi-trailer involved in the collision required brake and clutch repairs. (*Id.* ¶ 52.) When Mr. Michaels picked up the load of freight from Waupaca and departed with it for Thief River Falls at 2:34 p.m., Plaintiff alleges that he was already running late because of the time taken by those repairs. (*Id.* ¶¶ 48–49, 59.) The TAC alleges that, according to his log, Mr. Michaels stopped in Hudson, Wisconsin overnight, for a required ten-hour rest period, then departed for Thief River Falls the next morning at 6:35 a.m. (*Id.* ¶ 55.) Because the drive between Hudson and Thief River Falls is approximately five hours and twenty minutes, Plaintiff alleges that it was not possible for Mr. Michaels to deliver the freight on time by between 8:00 and 9:00 a.m. that morning. (*Id.* ¶¶ 56–57.) Plaintiff alleges that at 6:46 a.m. on June 13—11 minutes after starting to drive for the day—Mr. Michaels accessed his online Facebook account via his cell phone and created a post. (*Id.* ¶ 68.) According to Plaintiff's allegations, the collision resulting in Mr. Russ's death occurred a few minutes after Mr. Michaels's Facebook post. (*Id.* ¶ 58.)

Plaintiff's TAC alleges that the Minnesota State Patrol and various witnesses described the collision and its aftermath. The Minnesota Motor Vehicle Crash Report completed by the State Patrol stated that Mr. Michaels had just changed lanes, was distracted, was driving too fast for the conditions, and did not see traffic ahead of him slow down before the collision. (*Id.* ¶ 60; *see also* Pl.'s Ex. D at 1, 6, Dkt. No. 95-1.) One witness

---

49 C.F.R. subchapter B, parts 300–399. FMCSA, *Our Mission*, https://www.fmcsa.dot. gov/mission (last visited February 23, 2022). "[A]ll employers, employees, and commercial motor vehicles that transport property or passengers in interstate commerce" are required to comply with the FMCSRs. 49 C.F.R. § 390.3.

to the collision stated that she saw Mr. Michaels change lanes several times before striking Mr. Russ's car from behind. (Pl.'s Ex. B ¶ 61 (citing Pl.'s Ex. F at 2).) Another witness recounted that she saw Mr. Michaels wearing a pair of dual-sided headphones around his neck after the crash. (*Id.* ¶ 73.) The State Patrol determined that Mr. Michaels's semi-trailer struck Mr. Russ's car at highway speeds and that Mr. Michaels had neither tried to brake nor swerve before the impact. (*Id.* ¶ 62.) Mr. Michaels told the Minnesota State Patrol on the scene that he was "running very late" because of the repairs his semi-trailer had required the day before. (*Id.* ¶ 59 (citing Pl.'s Ex. F at 2).)

A criminal Complaint in this matter has been filed against Mr. Michaels, which Plaintiff incorporates, in part, into her proposed TAC, and states that Mr. Michaels's conduct before colliding with Mr. Russ

> constituted gross negligence in that his speed was greater than the conditions of the roadway would permit as safe or reasonable, his speed was far greater than the vehicles traveling in front of him which he acknowledged he saw, he was traveling through a high traffic area on his way to a delivery that he was significantly late for, he was admittedly looking at his mirrors and not the road in front of him just prior to the crash, he had been accessing his phone and Facebook less than 10 minutes before the crash, and he made no effort to slow his semi-tractor trailer which was traveling at highway speeds despite multiple vehicle[s] being in front of his vehicle.

(*Id.* ¶ 76 (citing Pl.'s Ex. F at 2).)

### 2.   Procedural Posture

On October 16, 2019, Plaintiff filed this case. (Complaint, Dkt. No. 1.) She filed the operative Second Amended Complaint ("SAC") on June 7, 2021. (SAC, Dkt. No. 95.) She brings 12 counts against Defendants. (*Id.* ¶¶ 121–88.) Relevant to this Motion relating to Ecklund Logistics and XPO Logistics, Plaintiff brings claims on behalf of Mr. Russ against

each of these Defendants for negligence, respondeat superior/vicarious liability, agency/vicarious liability, joint enterprise, joint venture, negligent hiring or selection and retention/supervision/entrustment, violations of the FMCSRs, and, on behalf of herself, a loss of consortium claim. (*Id.* ¶¶ 121–51, 157–61, 171–88.) She also claims that Ecklund Logistics and KLE Equipment were alter egos of each other and, as such, are vicariously liable for each other's torts. (*Id.* ¶¶ 152–56.) Plaintiff seeks actual damages for pecuniary losses from Mr. Russ's death, loss of consortium damages, medical bills and expenses, and funeral expenses, which she states exceed $10 million when combined. (*Id.* ¶¶ 189–92.)

On October 1, 2021, Defendants filed a Motion to Stay to await developments in Mr. Michaels's state-court criminal case (Defs.' Mot. Stay at 1, Dkt. No. 121), which this Court granted in part and denied in part, temporarily prohibiting any questioning of Mr. Michaels until his criminal case had "concluded by sentencing following a guilty plea or guilty verdict, or by dismissal of the charges[,]" but ordering "[a]ll other pretrial components of this case . . . [to] proceed as scheduled" (Oct. 19 Order at 2, Dkt. No. 131).

### 3.    The Parties' Positions on Plaintiff's Motions to Amend

Plaintiff moves for an Order granting her leave to amend her Complaint to add punitive damages claims against Defendants Ecklund Logistics and XPO Logistics. (Pl.'s Ecklund Mot. at 1; Pl.'s XPO Mot. at 1.) Regarding the legal standard that this Court should apply, Plaintiff argues that, while courts in this District have historically had divergent practices in determining whether to apply Minnesota Statute § 549.191–20 ("Minn. Stat. § 549.171–20") (a state statute governing punitive damages under Minnesota law) or Federal Rule of Civil Procedure 15 (a federal procedural rule governing motions to amend

the pleadings in federal civil actions), after the United States Supreme Court's decision in *Shady Grove Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) (holding that a class action lawsuit could proceed in federal court under Federal Rule of Civil Procedure 23, even though a New York statute procedurally prohibited it), most courts now apply Rule 15. (*Id.* at 16–17.) She argues this Court should do the same. (*Id.* at 21.)

Both Ecklund Logistics and XPO Logistics oppose Plaintiff's Motions to amend the SAC to add punitive damages against them and ask the Court to deny the Motions entirely. (Def. XPO Logistics's Mem. Opp'n at 1–4, Dkt. No. 153; Def. Ecklund Logistics's Mem. Opp'n at 1–2, Dkt. No. 154.) While Defendants agree with Plaintiff that Federal Rule of Civil Procedure 15 supplies the procedural rule of decision for these Motions, they contend that Minn. Stat. § 549.20 supplies the standard for measuring the legal sufficiency of the punitive damages claims pleaded. (XPO Logistics's Mem. Opp'n at 7–8; Def. Ecklund Logistics's Mem. Opp'n at 1–2.) They then argue that Plaintiff's proposed amendments fail to allege sufficient facts under § 549.20 to show that Defendants had the requisite knowledge of, or that they intentionally disregarded facts about, the high probability that Mr. Michaels might injure others, and, therefore, her proposed amendments are futile under Rule 15. (XPO Logistics's Mem. Opp'n at 7–15; Def. Ecklund Logistics's Mem. Opp'n at 20.)

Speaking on behalf of Defendants during oral arguments at the motions hearing, Defendants' counsel argued that neither Ecklund Logistics nor XPO Logistics had notice that Mr. Michaels was an unfit hire; that Mr. Michaels committed no hours of service violations or documented speeding violations during his transportation of the load; that

8

there was still time for Ecklund Logistics to change the delivery time for Mr. Michaels's freight load once it opened for business on June 13; that there is no private cause of action for violations of the FMCSRs; and that Mr. Michaels showed no indication of being under pressure.

### B.   Legal Standards for Plaintiff's Motions to Amend

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). The Court will review both below.

### 1.   Applicable Procedural Law

When evaluating a motion to amend a complaint to add a punitive damages claim, both Federal Rule of Civil Procedure 15(a)(2) and Minn. Stat. § 549.191 are candidates to provide the applicable procedural law. Fed. R. Civ. P. 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." The right to amend is not absolute, however. *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008). Leave to amend may be denied for "compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Id.* (citing *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005)).

Minn. Stat. § 549.191 requires a party seeking punitive damages to provide the court with "one or more affidavits showing the factual basis for the claim" and also requires the

9

party to specify which of several possible legal bases in Minn. Stat. § 549.20 it is premising its claim for punitive damages upon.

Since shortly after the U.S. Supreme Court's decision in *Shady Grove*, most courts in this district sitting in diversity have looked to Fed. R. Civ. P. 15(a)(2), not Minn. Stat. § 549.191, for the procedural law governing a  motion to amend a complaint to add a claim for punitive damages. *See, e.g., Shank v. Carleton College*, No. 16-CV-1154 (PJS/HB), 2018 WL 4961472 *4 (D. Minn. Oct. 15, 2018); *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, No. 15-MDL-2666 (JNE/FLN), 2017 WL 5187832, *5–6 (D. Minn. July 27, 2017). *But see Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, No. 15-CV-3183 (ADM/LIB), 2018 WL 9919941, at *31 (D. Minn. Mar. 8, 2018), *objs. overruled*, 351 F. Supp. 3d 1187 (D. Minn. 2018), *aff'd*, 962 F.3d 1015 (8th Cir. 2020) (holding that parties seeking to add a punitive damages claim must follow the procedure set out in Minn. Stat. § 549.191). In deciding the present Motions to Amend, this Court finds, consistent with the post-*Shady Grove* weight of authority in this district, that Federal Rule of Civil Procedure 15(a)(2) provides the applicable procedural law.

## 2.    Applicable Substantive State Law

However, a place still remains for Minnesota state law on punitive damages when a party opposing an attempt to amend a complaint by adding a punitive damages claim grounds its opposition to the amendment on an assertion that the amendment would be futile. In that situation—such as the one now before this Court—to decide futility, the federal court looks to Minnesota state <u>substantive</u> law on punitive damages, Minn. Stat. § 549.20, to find the elements that a party must prove to be awarded punitive damages and

10

measures Plaintiff's factual allegations against the substantive standards of that statute. *See Hamilton v. Franchoice, Inc.*, No. 19-CV-1426 (MJD/ECW), 2020 WL 2191219, at *6 (D. Minn. May 6, 2020) ("Section 549.20 governs the scope of punitive damages, and . . . Plaintiffs need to plausibly allege a claim for punitive damages that meets the substantive requirements of that statute . . . .").

Minn. Stat. § 549.20 states:

(a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.

(b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

(1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

(2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Minn. Stat. § 549.20, subd. 1.

Defendants Ecklund Logistics and XPO Logistics assert that Plaintiff should not be allowed to add a claim for punitive damages to her complaint because it would be futile. (Def. XPO Logistics's Mem. Opp'n at 2; Def. Ecklund Logistics's Mem. Opp'n at 1.) A proposed claim is futile if it "could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *See Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008). Rule 12(b)(6) requires dismissal when a pleading fails "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007). The party asserting the claim need not plead "detailed factual allegations," but mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. For a claim to be facially plausible, the party must allege "factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In applying this standard, the Court accepts the factual allegations as true and views them most favorably to the pleading party. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013).

Minn. Stat. § 549.20 requires clear and convincing evidence of deliberate disregard for the rights or safety of others. "Under Minnesota law, a complaint cannot be amended to add a claim for punitive damages unless the motion to amend is supported by prima facie clear and convincing evidence that a defendant has shown deliberate disregard for the rights and safety of others." *In re McNeilus Mfg. Explosion Coordinated Litig.*, No. 17-CV-5237 (PJS/KMM), 2019 WL 2387110, at *2 n.2 (D. Minn. June 6, 2019) (*citing Ulrich v. City of Crosby*, 848 F. Supp. 861, 868–69 (D. Minn. 1994)).

"Deliberate disregard occurs when 'the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others.'" *Id.* (citing Minn. Stat. § 549.20, subd. 1(b)). More than negligence or even gross negligence is required to sufficiently allege a claim for punitive damages. *See Dolphin Kickboxing Co. v. Franchoice, Inc.*, 335 F.R.D. 393, 401 (D. Minn. 2020). "In Minnesota, negligence is generally defined as the failure to exercise such care as persons of ordinary prudence usually exercise under such circumstances." *Anderson v. Rugged*

*Races LLC*, 496 F. Supp. 3d 1270, 1277 (D. Minn. 2020) (citing *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011)) (cleaned up). "Minnesota law defines gross negligence as without even scant care but not with such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong." *Dolphin Kickboxing Co.*, 335 F.R.D. at 401 n.4 (citing *Greer v. Walsh Constr. Co.*, No. 15-CV-465 (PAM/JSM), 2016 WL 6892109, at *8 (D. Minn. Feb. 23, 2016)) (cleaned up). With these procedural and substantive standards in mind, the Court now turns to the Motions at hand.

**C.    Discussion of Plaintiff's Motions to Amend**

On January 14, 2022, the Court granted Plaintiff's Motion to Supplement the Record with the proposed Third Amended Complaint ("TAC") (Pl.'s Ex. B, Dkt. No. 165-2), and the redlined copy of the proposed TAC (Pl.'s Ex. A, Dkt. No. 165-1). Because of that Order, these documents are considered part of the record upon which the Court will decide these Motions. (*See* Jan. 14 Order at 3.) The Court therefore disregards Defendants' arguments that the omission of these documents earlier is reason to deny the Motions for Leave to Amend,  as those omissions were mooted by the Court's January 14 Order.

When deciding whether Plaintiff has adequately alleged claims for punitive damages under Minn. Stat. § 549.20, the Court considers only what Plaintiff has alleged in her proposed TAC, disregarding Defendants' rebuttals and the evidence presented in opposition to Plaintiff's Motions. *See In re McNeilus*, 2019 WL 2387110, at *2 (citing *Iqbal*, 556 U.S. at 678) ("Under Rule 12(b)(6), courts look only at the sufficiency of the allegations in the proposed amended complaint to determine whether it contain[s] sufficient

13

factual matter, accepted as true, to state a claim to relief that is plausible on its face.")
(cleaned up).

Plaintiff's allegations in her proposed TAC must be measured against precisely what
the Minnesota punitive damages statute requires: (1) knowledge of—or an intentional
disregard of—facts that make injury to the plaintiff's rights highly probable; and (2)
deliberately proceeding with at least indifference—if not conscious or intentional
disregard—to the risk of injury. Minn. Stat. § 549.20. Mere conclusory statements that a
defendant had knowledge, or willfully disregarded it, are not sufficient. *See In re Bair
Hugger*, 2017 WL 5187832, at *7. The Court will take each Motion and the allegations
regarding each respective Defendant in turn below.

### 1.    Plaintiff's Proposed Amendments

Plaintiff's Proposed Third Amended Complaint contains three new paragraphs
setting forth the factual basis for her punitive damages claims under a proposed Count XIII
against XPO Logistics (Pl.'s Ex. B, ¶¶ 189–90) and Ecklund Logistics (*id.* ¶¶ 189, 191).

### a.    Plaintiff's Allegations Against XPO Logistics

Plaintiff reincorporates all allegations made in the proposed TAC (*id.* ¶ 189) and
newly alleges that Defendant XPO Logistics was aware of a high probability of harm to
others because: (1) XPO knew that violating the FMCSRs' hours of service regulations
creates dangers; (2) disregarded those known dangers; and (3) aided, abetted, and
encouraged Ecklund Logistics and Mr. Michaels to violate the hours of service regulations
in violation of 49 C.F.R. § 390.13 (which prohibits any person from aiding, abetting, and
encouraging violations of the FMCSRs) (*id.* ¶ 190). If these allegations amount to clear

and convincing evidence that XPO Logistics had (i) knowledge which it (ii) intentionally disregarded despite (iii) the high probability that the rights or safety of others could be injured, then Minn. Stat. § 549.20 is satisfied, the proposed amendment is not futile, and Plaintiff's Motion as to XPO Logistics should be granted. The Court takes all facts alleged in the proposed Third Amended Complaint as true for the purposes of the following analysis.

### i.    XPO Logistics's Alleged Knowledge

Plaintiff alleges that XPO Logistics knew about (1) the parameters that it gave to Ecklund Logistics regarding the June freight load; (2) the agreements that it had in place with Ecklund; and (3) the details of Mr. Michaels's departure time, trip duration, and scheduled delivery time.

Specifically, Plaintiff alleges that XPO Logistics sent an email to the original shipper on June 11, 2019—two days before the collision—stating, "All set for tomorrow. Driver will be unloading in Neenah at 830AM, then headed to our shipper (30 miles or so). ETA 11AM. We will deliver at 8AM Thursday." (Pl.'s Ex. B ¶ 40.) According to the TAC, the original shipper asked XPO Logistics to pick up the load of freight between 7:00 a.m. and 3:00 p.m. (*Id.* ¶ 41.) Plaintiff alleges that XPO Logistics reassigned transportation of the load to Ecklund Logistics, over whom it "had the right to control the means and manner of how Ecklund Logistics and [Mr. Michaels] carried out the shipment" by various contractual agreements, including the June 11, 2019 Carrier Rate Confirmation/Load

Confirmation Agreement, the November 8, 2012 Brokerage Agreement, and the April 29, 2019 Motor Carrier Transportation Agreement. (*Id.* ¶¶ 42–48.)[3]

Plaintiff also alleges that the April 2019 Agreement "expressly prohibited Ecklund Logistics from transporting any shipment that would require Ecklund Logistics to violate the law, speed limits, safety rules, and federal hours-of-service rules," and required it to notify XPO Logistics of "any expected [or] actual inability to meet the scheduled pick up or delivery appointment time." (*Id.* ¶ 48(h), (j)(2).) Plaintiff alleges that XPO Logistics also required Ecklund Logistics to be responsible for late delivery penalties imposed by customers. (*Id.* ¶ 48(q).) Additionally, the TAC alleges that XPO Logistics required Ecklund Logistics to effectively screen, monitor, and train its employees who handled XPO Logistics's cargo, and retained the right to verify Ecklund's compliance with their agreement. (*Id.* ¶ 48(x), (ll).) Plaintiff alleges that in the June 11, 2019 Agreement, XPO Logistics instructed Ecklund Logistics on the pick-up and delivery schedule required for transportation of the June 12 load, and directed Ecklund to call XPO at least twice a day, as well as to call and report pick-up, transit status, delivery status, and any issues affecting transportation of the load. (*Id.* ¶ 45.)

Based on these agreements, Plaintiff alleges that XPO Logistics knew that Mr. Michaels picked up the load of freight at 2:34 p.m. on June 12, 2019; that his trip would take approximately 8 hours and 45 minutes; and that the freight delivery deadline was

---

[3] The Court notes that two paragraphs in the TAC are numbered 48, and here refers to the first paragraph labeled 48 in the TAC. That paragraph begins on page 16. All subsequent references to paragraph 48 shall refer to the first paragraph 48 unless otherwise noted.

between 8:00 and 9:00 a.m. on June 13. (*Id.* ¶¶ 48–50, 57.) According to Plaintiff, XPO Logistics also knew about "the laws and the dangers of violating the laws surrounding the FMCSR's hours of service regulations while driving[,]" which, *inter alia*, included a required a ten-hour rest period after 14 hours of driving. (*Id.* ¶ 190.) *See* 49 C.F.R. § 395.1(g). There are no facts in the TAC that show whether, or at what time or times on June 12 or 13, Ecklund Logistics gave XPO Logistics the updates required by their agreements.

### ii.      Facts that XPO Logistics Allegedly Disregarded

Plaintiff alleges that XPO had a duty of care to the general public to know whether Ecklund Logistics, with whom it contracted to meet its motor carrier obligations, "was a safe, professional, and competent motor carrier" that "hired safe, professional, and competent motor carriers and drivers." (*Id.* ¶¶ 101, 172, 175–76.) The TAC alleges that XPO Logistics failed to perform its duty and disregarded facts it should have known about Ecklund Logistics's dangerous and unprofessional business practices, when it failed to review and consider Ecklund's insurance claim history, past lawsuits, and general reputation. (*Id.* ¶¶ 102–20, 173–74.)

According to Plaintiff, these dangerous and unprofessional business practices that XPO Logistics should have known about included Ecklund Logistics's history of poor hiring decisions; "collisions, unsafe driving and financial instability"; being underinsured; pressuring its drivers to exceed their federally allowed service hours; permitting or encouraging drivers to maintain inaccurate log books; conducting questionable "hiring,

17

training, supervision, retention, and company safety practices"; permitting drivers to film videos on their cell phones while driving; and being assessed State and Federal tax liens and judgments (which left Ecklund Logistics in such financial straits that it had an incentive to economize by operating unsafely). (*Id.*) Plaintiff further alleges that XPO Logistics also disregarded the dangers of violating the FMCSRs' hours of service regulations. (*Id.* ¶ 190.) The TAC states that, "[h]ad XPO Logistics exercised due care, it knew or should have known that Ecklund Logistics and [Mr. Michaels] were incompetent and unsafe to act as the contractor to transport the freight which was involved in the fatal collision." (*Id.* ¶ 177.)

### iii.     The Probability of Injury to the Rights or Safety of Others

Plaintiff alleges that XPO Logistics had a duty of reasonable care to ensure that any entity it hired to transport its freight—a task "which involved a risk of physical harm unless it was skillfully and carefully done"—acted in accordance with XPO's own duty of care owed to third persons, such as the general public. (*Id.* ¶ 174.) According to the TAC, the April 2019 Agreement between XPO Logistics and Ecklund Logistics required Ecklund to obey the law, the speed limit, safety rules, and federal hours of service regulations, which shows that XPO Logistics retained the right to control the means and manner of how Ecklund and Mr. Michaels conducted the transportation of the June 2019 freight load. (*Id.* ¶ 48.) Plaintiff alleges that this also shows an awareness on XPO Logistics's part that regulations ranging from cell phone use while driving to obeying hours of service requirements are "vitally important to the safety of the motoring public[,]" and that failing to follow them "poses a significant danger to the motoring public" and "can lead to

18

commercial vehicle crashes." (*Id.* ¶¶ 48(h), 70, 116.)  According to Plaintiff, XPO Logistics also knew or should have known that Ecklund Logistics's history of causing harm to people and property presented a risk of similar potential future harms. (*Id.* ¶¶ 102–20, 173–74.) Plaintiff alleges that the June 13 accident was so horrific that it is itself evidence of the probability of injury, as well as of "carelessness, negligence, and unlawful hiring, retention, supervision, and entrustment[,]" actions that "were the direct cause of the collision which killed Andrew Russ." (*Id.* ¶¶ 160, 178.)

### iv.     Plaintiff's Supporting Arguments

In her Memorandum in Support of her Motion to Amend regarding XPO Logistics, Plaintiff argues that her proposed TAC sufficiently alleges that XPO Logistics had control over the details of Mr. Michaels's June 13 freight delivery schedule pursuant to its Motor Carrier Transportation Agreement with Ecklund Logistics, knew that Ecklund and Mr. Michaels did not have enough time to complete that delivery on time, and applied pressure to Ecklund and Mr. Michaels to exceed industry standards and violate FMSCRs or face punishing financial consequences for late delivery. (Pl.'s Mem. Supp. XPO Mot. at 2–11, Dkt. No. 136.) Based on XPO Logistics's power to control the delivery schedule, Plaintiff contends that her proposed TAC sufficiently alleges that XPO aided, abetted, encouraged, or required Ecklund Logistics and Mr. Michaels to violate regulations contained in 49 C.F.R. § 390.13 (which prohibit any person from aiding, abetting, and encouraging violations of the FMCSRs) because it cared more about timely freight delivery to its customers than the safety of the motoring public. (*Id.* at 21–23.)

Under Rule 15, Plaintiff argues that her Motion to Amend regarding XPO Logistics should be granted because justice requires it under the case facts; she has demonstrated no undue delay or bad faith; it would not result in unfair prejudice to XPO Logistics; and the amendments would not be futile. (*Id.* at 17.) She also argues that, even if the Court applies Minn. Stat. § 549.191–20 as the legal standard for measuring her proposed TAC's sufficiency, her Motion should still be granted because, under that Statute, she need only allege prima facie evidence of XPO Logistics's deliberate disregard for the rights and safety of others, which she claims she has done. (*Id.* at 17–18.)

Plaintiff also cites various out-of-Circuit cases in which hours of service and speeding violations have resulted in courts permitting punitive damages claims. (*Id.* at 22–23 (citing, *e.g., Gonzalez v. Seashore Fruit & Produce*, No. 19-CV-1422, 2020 WL 2571101, at *2 (E.D. Pa. May 21, 2020) (finding the facts alleged sufficient to amend a complaint to add a punitive damages claim where a defendant had allegedly driven longer than allowed under the hours of service regulations, his employer knew of its driver's violation, and the driver caused a collision where he failed to see a slower car in front of him and did not brake until the impact was less than two seconds away); *Trotter v. B & W Cartage Co.*, No. 05-CV-0205 (MJR), 2006 WL 1004882, at *7 (S.D. Ill. Apr. 13, 2006) (concluding at summary judgment that a reasonable jury could find punitive damages warranted where an employer "operated with conscious indifference to its regulatory duty to maintain management systems effective in preventing hours of service violations by drivers")).) However, Plaintiff conceded during oral argument that there are no binding precedents in this Circuit. Based on the facts and persuasive caselaw, Plaintiff claims that

the Court should grant her Motion and permit her to plead a claim for punitive damages against XPO Logistics. (*Id.* at 23.)

### v.        XPO Logistics's Opposing Arguments

XPO Logistics opposes Plaintiff's Motion for leave to add a punitive damages claim against it and asks the Court to deny Plaintiff's Motion in its entirety. (Def. XPO Logistics's Mem. Opp'n at 1–4.) In its Memorandum in Opposition to this Motion, XPO Logistics argues that Plaintiff's Motion fails to meet the Rule 15 standard because, under a Rule 12(b)(6) standard, the proposed amendment is futile where Plaintiff does not set forth a legally sufficient claim for punitive damages under Minnesota law against XPO Logistics. (*Id.* at 7–15.) XPO Logistics also contends that Count XI of the proposed TAC improperly brings a claim for violations of the FMCSRs because "'there is no federal private right of action allowing personal injury or wrongful death plaintiffs to hold defendants liable for violations of the FMCSR.'" (*Id.* at 7 (citing *Leon v. FedEx Ground Package Sys., Inc.*, No. 13-CV-1005 (JB/SCY), 2016 WL 836980, at *11 (D.N.M. Feb. 16, 2016).)

### vi.        Holding

As a threshold matter, the Court addresses XPO Logistics's argument that there is no private right of action to allege violations of the FMCSRs, and that without such a right, Plaintiff has no foundation for her punitive damages claims. The Court assumes, without deciding, that allegations in the TAC of harm to a member of the public—which the FMCSRs were intended to protect—along with criminal charges alleging just such a harm (the death of a motorist), are enough at the pleading stage to allow Plaintiff to *allege*

punitive damages. *See Berczyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, 1008 (D. Minn. 2003) (citing *Olson v. Snap Prod., Inc.*, 29 F. Supp. 2d 1027, 1034 (D. Minn. 1998) ("A plaintiff need not demonstrate an entitlement to punitive damages *per se*, but only an entitlement to allege such damages."); *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 861 (8th Cir. 2010) (declining to decide the merits of defendant's arguments that only a member of the public is an intended beneficiary of the FMCSRs and may bring claims under them where the plaintiff was a co-driver (rather than a member of the public) and failed to plead a claim under the FMCSRs.).

The Court also observes that at least four times, courts in this Circuit applying Missouri's punitive damages law have expressly "allow[ed] evidence of failures to follow motor carrier regulations and industry standards to support awards of punitive damages against commercial motor carriers[,]" *see, e.g., Harris v. Decker Truck Line, Inc.*, No. 4:12-CV-1598 (DDN), 2013 WL 1769095, at *5 (E.D. Mo. Apr. 24, 2013); *Coon v. Am. Compressed Steel, Inc.*, 207 S.W.3d 629, 637–39 (Mo. Ct. App. 2006); *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 160 (Mo. 2000); and *Garrett v. Albright*, No. 06-CV-0785 (NKL), 2008 WL 795613, at *6 (W.D. Mo. Mar. 21, 2008). Missouri's substantive law on punitive damages is similar to Minnesota's: "Under Missouri law, punitive damages are appropriate where a party 'either knew or had reason to know that there was a high degree of probability that the defendant's conduct would result in injury.'" *Garrett*, 2008 WL 795613, at *6 (citing *Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc.*, 700 S.W.2d 426, 436 (Mo. 1985)). "With such a showing, a plaintiff can recover for aggravating circumstances based upon the defendant's complete indifference to or

conscious disregard for the safety of others." *Id.* (citing *Lopez*, 26 S.W.3d at 160).)
Additionally, XPO Logistics's out-of-Circuit citation to the District of New Mexico's
holding in *Leon*, 2016 WL 836980, at *11, presents only a persuasive precedent, albeit a
compelling one.

Viewing Plaintiff's allegations together as a whole and taking them as true for
purposes of this Motion, the Court concludes that Plaintiff fails to plausibly allege on the
face of the proposed TAC that XPO Logistics acted with deliberate disregard for the rights
and safety of others. The facts alleged do not provide clear and convincing evidence that
XPO Logistics knew or should have known that Mr. Michaels did not have enough time to
deliver the load of freight, or that this would incentivize him to violate regulations about
hours of service. Plaintiff has not alleged that Ecklund Logistics informed XPO Logistics
that its driver could not deliver the load on time, much less that XPO reacted with
indifference to that information. Plaintiff's assertion that (1) XPO knew that violating the
FMCSRs' hours of service regulations creates dangers; (2) disregarded those known
dangers; and (3) aided, abetted, and encouraged Ecklund Logistics and Mr. Michaels to
violate the hours of service regulations in violation of 49 C.F.R. § 390.13 (*id.* ¶ 190) is
conclusory because it is not sufficiently supported by the facts alleged as a whole in the
proposed TAC.

In sum, Plaintiff's allegations do not amount to clear and convincing evidence, even
if unrebutted, that XPO Logistics acted with willful indifference to a highly probable risk
of harm to the rights and safety of others. Because Plaintiff's allegations do not meet the
substantive state law requirements under Minn. Stat. § 549.20 subd. 1, the Court concludes,

23

pursuant to Federal Rule of Civil Procedure 15(a)(2), that Plaintiff's proposed amendments are futile because the allegations could not withstand a motion to dismiss. *See* Fed. R. Civ. P. 15(a)(2); *see also In re Bair Hugger*, 2017 WL 5187832, at *8 (citing *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998)). Therefore, the Court denies Plaintiff's Motion seeking leave to amend the Complaint to add punitive damages as to XPO Logistics.

### b.    Plaintiff's Allegations Against Ecklund Logistics

Plaintiff reincorporates all allegations made in the proposed TAC (Pl.'s Ex. B ¶ 189) and newly alleges that Defendant Ecklund Logistics (1) hired  Mr. Michaels as a driver despite knowing his history of unsafe and unprofessional commercial driving; (2) knew that violating the FMCSRs' hours of service regulations creates dangers; (3) disregarded those known dangers; and (4) aided, abetted, and encouraged Mr. Michaels to violate the hours of service regulations in violation of 49 C.F.R. § 390.13 (which prohibit any person from aiding, abetting, and encouraging violations of the FMCSRs) (*id.* ¶ 191). If these allegations amount to clear and convincing evidence that Ecklund Logistics had (i) knowledge which it (ii) intentionally disregarded despite (iii) the high probability that the rights or safety of others could be injured, then Minn. Stat. § 549.20 is satisfied, the proposed amendment is not futile, and Plaintiff's Motion as to Ecklund Logistics should be granted. The Court takes all facts as alleged in the proposed Third Amended Complaint as true for the purposes of the following analysis.

i.       **Ecklund Logistics's Alleged Knowledge**

Plaintiff alleges that Ecklund Logistics knew about (1) its own policies and practices; (2) Mr. Michaels's past employment history and criminal record; (3) the parameters of its role as the motor carrier that XPO Logistics hired for the June 2019 load; and (4) that on June 12, Mr. Michaels departed late with XPO's load.

Specifically, the TAC alleges that Ecklund Logistics knew its own policies and practices, including its "company safety history" and its "policies regarding hiring, supervision, and retention of employees; entrustment of vehicles and equipment to employees; driver qualification, safety, and professionalism; competence; compliance with state and federal regulations; and vehicle and equipment ownership, leasing, insuring, inspection, and maintenance." (*Id.* ¶ 100.) Plaintiff alleges that Ecklund Logistics also knew of its "past history of serious and fatal collisions, and other unsafe, illegal, and unprofessional practices," including having previously "caus[ed] damages in excess of its insurance coverage" and having a "lengthy and public history of litigation, judgments, and State and Federal tax liens and judgments." (*Id.* ¶¶ 103–04, 109–13, 118.)

Moreover, Plaintiff alleges that Ecklund Logistics knew about Mr. Michaels's past employment history and criminal record, all of which indicated that he lacked "the judgment, professionalism, and competence necessary to safely operate commercial vehicles." (*Id.* ¶¶ 78, 191.) According to Plaintiff, Ecklund Logistics knew that Mr. Michaels's history included that he had: been terminated from his prior job one week before the June 13 collision because of a safety clearance suspension; failed all areas of an annual "check-ride" six months before the June 13 collision because he made "several

25

unsafe decisions" and a reviewer had found Mr. Michaels to be "a big danger to himself and others on the road"; and been terminated three years before the June 13 collision because he allowed his semi-trailer to roll away. (*Id.* ¶ 81.) Plaintiff alleges that Ecklund Logistics also had access to Mr. Michaels's criminal history and knew or should have known that he had convictions for a felony and several misdemeanors, and citations for failing to wear a seat belt and carry motor vehicle insurance when operating a vehicle. (*Id.* ¶ 84.)

When XPO Logistics hired Ecklund Logistics to be the motor carrier hauling the June 2019 load, Plaintiff alleges that Ecklund knowingly agreed to certain parameters for the freight load. (Pl.'s Ex. B ¶¶ 42–43.) According to the TAC, these included that Ecklund Logistics would: pick up the load on June 12, 2019, between 7:00 a.m. and 3:00 p.m.; deliver the load on June 13, 2019, between 8:00 a.m. and 9:00 a.m.; call XPO Logistics to report the pickup, transit status, and delivery status; call XPO at least twice a day minimum while carrying its freight; and immediately report "discrepancies or incident[s] affecting transportation" of the load. (*Id.* ¶ 45.) Plaintiff alleges that Ecklund Logistics also agreed to transport shipments without delay and to immediately notify XPO Logistics of likely delays (*id.* ¶ 47(b)); to not violate the law, speed limits, safety rules, or hours of service rules (*id.* ¶ 48(h)); to notify XPO of changes in pick-up or delivery times (*id.* ¶ 48(j)); to pay XPO any assessed charges for late delivery without prior notice and to bear the expense for late delivery (*id.* ¶ 48(l), (o), (q)); and to track driver movements and effectively screen, monitor, and train drivers handling its cargo (*id.* ¶ 48(x)). Additionally, Plaintiff alleges that on June 12, 2019, Ecklund Logistics knew that Mr. Michaels picked up the freight load

26

later than anticipated because of brake and clutch repairs that had to be completed before Mr. Michaels could depart. (*Id.* ¶¶ 48,[4] 59.)

### ii.     Facts that Ecklund Logistics Allegedly Disregarded

According to the TAC, although Ecklund Logistics knew or should have known that Mr. Michaels's employment history and criminal record demonstrated his unfitness to safely operate commercial vehicles, Ecklund failed to investigate—or simply ignored— this information, hiring him despite these facts. (*Id.* ¶¶ 78–86, 98.) Plaintiff alleges that Ecklund Logistics, as Mr. Michaels's employer, also imposed an unrealistic delivery timeline upon Mr. Michaels for the June 2019 load of freight, even though this unrealistic timeline would pressure Mr. Michaels to drive unsafely and to violate the FMCSRs to follow Ecklund's delivery instructions. (*Id.* ¶¶ 67, 77.) According to Plaintiff, in dispatching Mr. Michaels with too little time, Ecklund Logistics disregarded the known dangers that violating the FMCSRs' hours of service regulations created, including risks of injury to the motoring public. (*Id.* ¶ 191.)

### iii.    The Probability of Injury to the Rights or Safety of Others

Plaintiff alleges that the high risk of Ecklund Logistics's conduct is self-evident: fatal collisions with the motoring public. According to Plaintiff, this risk existed whether any member of the motoring public was actually harmed, but was, in fact, realized when Mr. Russ lost his life in the fatal collision. Plaintiff alleges that his death resulted from

---

[4] The Court here refers to the second paragraph labeled paragraph 48 in the proposed TAC which is located on page 28.

Ecklund Logistics's disregard of Mr. Michaels's unfitness to safely operate commercial vehicles, combined with its disregard of the fact that Mr. Michaels did not have enough time to safely deliver the load of freight by between 8:00 and 9:00 a.m. on June 13, 2019. (*Id.* ¶¶ 78, 83, 87, 97, 122–23, 128–29, 134–35, 141–42, 146–47, 150–51, 153, 156, 159–61.) The TAC alleges that Ecklund Logistics's duty to adequately evaluate applicants, supervise drivers, and monitor employee performance—which it failed to do with Mr. Michaels—exists to reduce the probability of injury to "the public and/or its property" by placing responsibility on employers to refuse to hire or retain incompetent or negligent applicants or employees. (*Id.* ¶ 159.) Plaintiff further alleges that violating the FMCSRs' hours of service regulations risks the very injuries to the motoring public that occurred here in Mr. Russ's death. (*Id.* ¶ 191.)

### iv.      Plaintiff's Supporting Arguments

In her Memorandum in Support of her Motion to Amend regarding Ecklund Logistics, Plaintiff argues that her Motion against Ecklund Logistics should be granted because justice requires it under the case facts; she has demonstrated no undue delay or bad faith; it would not result in unfair prejudice to Ecklund Logistics; and the amendments would not be futile. (Pl.'s Mem. Supp. Ecklund Mot. at 18, Dkt. No. 140.) Plaintiff argues that her proposed TAC sufficiently alleges under Rule 15 that Ecklund Logistics disregarded warnings about unsafe and unprofessional driving in Mr. Michaels's employment application when it hired him—warnings that should have led Ecklund to decline to hire Mr. Michaels. (*Id.* at 3–8.) She also argues that the proposed TAC sufficiently alleges Ecklund Logistics dispatched Mr. Michaels on June 12, 2019, with an

unrealistic delivery timeline—a timeline that would necessitate violations of industry standards and FMCSRs, and a breach of his duty of care to the motoring public—to achieve on-time delivery, all while threatening him with punishments for late freight deliveries. (*Id.* at 8–12.)

Plaintiff claims that, even if the Court applies Minn. Stat. § 549.191 as the legal standard for measuring her proposed TAC's sufficiency, her Motion should still be granted because, under that Statute, she need only allege prima facie evidence of Ecklund Logistics's deliberate disregard for the rights and safety of others, which she claims she has done. (*Id.* 18–19.) In support of her position, Plaintiff again cites various out-of-Circuit cases in which hours of service and speeding violations have resulted in courts permitting punitive damages claims. As before, Plaintiff concedes there are no binding precedents in this Circuit. (*Id.* at 23–24.)

**v.      Ecklund Logistics's Opposing Arguments**

Ecklund Logistics opposes Plaintiff's Motion and asks the Court to deny it in its entirety. (Def. Ecklund Logistics's Mem. Opp'n at 1–2.) Ecklund Logistics argues that Plaintiff's proposed TAC fails to allege sufficient facts that Ecklund had the requisite knowledge of, or that it intentionally disregarded facts about, the alleged high probability that Mr. Michaels might injure others. (*Id.* at 20.) It claims that it lawfully hired and dispatched Mr. Michaels, and each of these arguments will be discussed below. (*Id.* at 20–34.)

As to hiring, Ecklund Logistics claims that Plaintiff admits that Ecklund's duty to hire qualified drivers is governed by Title 49 C.F.R. § 391.11 (setting forth qualifications

29

for qualified motor carriers). (*Id.* at 20 (citing Pl.'s Mem. Supp. Ecklund Mot. at 22).) It claims Plaintiff offers no evidence that Ecklund Logistics violated the standard of care recognized by the FMCSRs. (*Id.* at 23.) Specifically, Ecklund Logistics claims that Plaintiff has not adequately alleged that Ecklund knew of any facts that showed Mr. Michaels's unfitness to drive a commercial motor vehicle for Ecklund under the 49 C.F.R. § 391.11 qualified motor carrier standard, or that Ecklund failed to properly investigate Mr. Michaels's background under the standard set forth in 49 C.F.R. § 391.23(a) (which gave Ecklund 30 days from Mr. Michaels's hire date to investigate his fitness as an employee). (*Id.* at 20–25.) As to Plaintiff's claim that Ecklund Logistics should have searched Mr. Michael's social media sites and been aware of his alleged exhibitions of unprofessionalism, Ecklund contends that, under Wisconsin's Internet Privacy Protection Statute, employers may not ask for access to a prospective employee's social media account, nor is there a statute that creates a duty for employers to view prospective employees' social media accounts that are in the public domain. (*Id.* at 25 (quoting Wis. Stat. § 995.55).) Similarly, as to Mr. Michaels's criminal record, Wisconsin's Fair Employment Act prohibits employers from discriminating against prospective employees based on their conviction records. (*Id.* at 29 (quoting Wis. Stat. § 111.321).)

As to dispatching Mr. Michaels to carry a freight load on June 12, 2019, Ecklund Logistics argues that Plaintiff's conclusory statements that it gave Mr. Michaels the impossible choice of either violating regulations, or traveling too quickly for conditions, fails the *Iqbal*/*Twombly* pleading standard. (*Id.*) Ecklund Logistics claims that Plaintiff has not set forth clear, convincing, admissible evidence of Ecklund's knowledge of highly

probable harm—or the intentional disregard of it—in dispatching Mr. Michaels on June 12, but instead offers pleadings that are mere supposition. (*Id.* at 30.) Finally, Ecklund Logistics claims that the criminal charges against Mr. Michaels regarding the June 13, 2019 collision are for gross negligence, a lower standard than the heightened "deliberate disregard" under Minn. Stat. § 549.20, sub. 1(b) that is akin to "willful indifference," so even if Mr. Michaels is convicted of the charges—which he has not yet been—allegations relating to the criminal case supply no grounds for punitive damages against Ecklund. (*Id.* at 34–35.)

### vi.      Holding

The Court finds that, taking Plaintiff's allegations as a whole as true and asking whether, if unrebutted, they would support a judgment in Plaintiff's favor, Plaintiff has alleged sufficient facts that the elements of a punitive damages claim are present. To find Plaintiff's pleadings sufficient, Plaintiff must allege enough to reasonably allow the Court to conclude that clear and convincing evidence plausibly supports that Ecklund Logistics acted with willful indifference.

Here, there are allegations that, if unrebutted, constitute prima facie evidence of more than mere negligence or gross negligence. Ecklund Logistics chose to hire Mr. Michaels and to dispatch him with a load of freight for an allegedly unrealistic delivery deadline during his first week on the job for Ecklund. The Court can reasonably draw an inference from the proposed TAC's allegations that Ecklund Logistics knew or should have known that employing Mr. Michaels to operate a semi-trailer meant placing someone with a record of unsafe driving practices on the road with the motoring public, and knew that,

given Mr. Michaels's late departure on June 12, 2019, Mr. Michaels would not be able to deliver the load on time. Yet, according to Plaintiff's allegations, Ecklund Logistics did not provide Mr. Michaels with any alternative schedule—a silence tantamount to requiring Mr. Michaels to try to deliver the load on time. Furthermore, Plaintiff alleges nothing that indicates that Mr. Michaels had the independent authority to alter his delivery schedule.

Based on these allegations, there is enough to conclude that clear, convincing, and admissible evidence plausibly supports the proposition that Ecklund Logistics acted with willful indifference. As alleged, Ecklund Logistics knew or should have known that Mr. Michaels did not have enough time to both deliver the load and follow reasonable road safety practices and hours of service regulations. It knew or should have known that this would incentivize him to cut corners that the law does not allow to be cut—such as unreasonably driving too quickly and aggressively for traffic conditions and violating the hours of service regulations—yet did nothing to either alter the delivery schedule or notify Mr. Michaels that he would not face any punitive consequences for a late delivery (despite Ecklund Logistics's alleged policies to the contrary). These facts connect knowledge and deliberate disregard despite the risks to the motoring public as required by Minn. Stat. § 549.20—risks borne out by the fatal collision on June 13. Such actions represent more than just allowing events to unfold "without even a scant care"; these allegations rise to the level of "reckless disregard for the probable consequences" equating to "a willful and intentional wrong." *See Dolphin Kickboxing Co.*, 335 F.R.D. at 401 n.4.

Therefore, Plaintiff's allegations that (1) Ecklund Logistics knew that violating the FMCSRs' hours of service regulations creates dangers; (2) disregarded those known

dangers; and (3) aided, abetted, and encouraged Mr. Michaels to violate the hours of service regulations in violation of 49 C.F.R. § 390.13 (*id.* ¶ 191) are sufficiently supported by the facts alleged in her proposed TAC. Plaintiff's allegations, if found credible by a jury, would allow a factfinder to determine that Ecklund Logistics knew (or should have known) of a high risk that Mr. Michaels would drive unsafely on June 12 and 13, but that it intentionally disregarded the risk because it cared more about getting XPO Logistics's load delivered than it did about safety. *In re Bair Hugger*, 2017 WL 5187832, at *8 (citing *Iqbal*, 556 U.S. at 678).

In sum, because Plaintiff has alleged facts that, if unrebutted, amount to clear and convincing evidence that Ecklund Logistics acted with willful indifference to a known or ascertainable risk of probable harm, Plaintiff's TAC meets the standard of Minn. Stat. § 549.20. The Court concludes, pursuant to Federal Rule of Civil Procedure 15(a)(2), that Plaintiff's Motion as to Defendant Ecklund Logistics is not, therefore, futile. Accordingly, the Court grants Plaintiff's Motion seeking leave to amend the Complaint to add punitive damages as to Ecklund Logistics. Plaintiff shall file her proposed Third Amended Complaint and, for the reasons that follow, shall do so within 14 days of the date of this Order.

## II.   SUBJECT-MATTER JURISDICTION

Federal courts have an obligation to inquire into subject-matter jurisdiction, even if no party raises the issue. *See Arbaugh v. Y&H Corp.,* 546 U.S. 500, 514 (2006) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)); *Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 609 (8th Cir. 2018) (citing *Arbaugh*)*; Reece v. Bank of New York*

*Mellon*, 760 F.3d 771, 777 (8th Cir. 2014) (citation omitted). In line with this legal principle, because the Court has a concern with the way in which subject-matter jurisdiction is pleaded, it *sua sponte* considers the adequacy of the operative pleadings as to federal subject-matter jurisdiction in this action.

### A.    Background

Plaintiff alleges that she "is Wife and Trustee for the Heirs and Next of Kin of Andrew Russ, deceased, and is a citizen of Minnesota." (SAC ¶ 2.) For each respective Defendant named in this action, Plaintiff alleges that: XPO Logistics, LLC has a "principal place of business . . . [in] Connecticut" (*id.* ¶ 5); Ecklund Logistics, Inc. "is a Wisconsin corporation with its principal place of business . . . [in] Wisconsin" (*id.* ¶ 8); KLE Equipment Leasing, LLC "is a Wisconsin corporation sharing a principal place of business . . . [in] Wisconsin" (*id.* ¶ 10); and Shane Thomas Michaels "is a resident of the State of Wisconsin" (*id.* ¶ 12).

### B.    Legal Standard for Federal Subject-Matter Jurisdiction

Subject-matter jurisdiction is a threshold requirement for federal-court litigation; where it is lacking, a federal court cannot proceed with an action. *See, e.g.*, *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94 (1998)). Furthermore, it is a plaintiff's burden to show that subject-matter jurisdiction exists. *See, e.g.*, *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2011) (citing *Green Acres Enters., Inc. v. United States*, 418 F.3d 852, 856 (8th Cir. 2005)). Under Rule 8 of the Federal Rules of Civil Procedure, a "pleading that states a claim for relief"—such as the Complaint—"must

contain . . . a short and plain statement of the grounds for the court's jurisdiction." Fed. R. Civ. P. 8(a)(1). Plaintiff contends that this Court has subject-matter jurisdiction over this action based on Title 28 U.S.C. § 1332 (diversity of citizenship jurisdiction). (SAC ¶ 16.) However, as currently pleaded, Plaintiff's SAC fails to allege this Court's subject-matter jurisdiction with the specificity required.

In relevant part, Title 28 U.S.C. § 1332 states that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States[.]" 28 U.S.C. § 1332(a)(1). Diversity jurisdiction demands "complete diversity": each defendant must be a citizen of a different state from each plaintiff. *See, e.g., Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978); *Junk v. Terminix Int'l Co.*, 628 F.3d 439, 445 (8th Cir. 2010) (quoting *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 620 (8th Cir. 2010)).

C.   **Discussion of the Party Citizenships Alleged in the SAC**

For the pleadings to establish diversity, a plaintiff "must set forth with specificity the citizenship of the parties." *Barclay Square Properties v. Midwest Fed. Sav. & Loan Ass'n of Minneapolis*, 893 F.2d 968, 969 (8th Cir. 1990) (citation omitted). While the Plaintiff's SAC sufficiently alleges the citizenship of Ecklund Logistics as a corporation, *see In re Arrowhead Cap. Mgmt. LLC Class Litig.*, 712 F. Supp. 2d 924, 930 (D. Minn. 2010), Plaintiff's SAC requires amendment to adequately plead the citizenship of the LLC and individual Defendants as follows.

35

1.      **Citizenship of Limited Liability Companies**

Defendants XPO Logistics and KLE Equipment are limited liability companies. "[F]or purposes of diversity jurisdiction, a limited-liability company ('LLC') takes the citizenship of all of its members and 'sub-members' and 'sub-sub-members.'" *Key Enterprises, LLC v. Morgan*, No. 12-CV-2628 (PJS/JSM), 2013 WL 353911, at *1 (D. Minn. Jan. 29, 2013). Merely alleging where an LLC is located or principally conducts business is insufficient. *See Grover-Tsimi v. Am. Laser Centers, LLC*, No. 09-CV-2729 (DSD/JJK), 2010 WL 550973, *1 (D. Minn. Feb. 9, 2010). "When one of the parties to the action is a limited partnership, the citizenship of each general and limited partner must be considered in determining whether complete diversity of citizenship exists." *Barclay Square Properties*, 893 F.2d at 969 (citing *Stouffer Corp. v. Breckenridge*, 859 F.2d 75, 76 (8th Cir. 1988)). "'[B]ecause a member of a limited liability company may itself have multiple members—and thus may itself have multiple citizenships—the federal court needs to know the citizenship of each "sub-member" as well[,]'" if any. *Fifth Third Mortg. Co. v. Lamey*, No. 12-CV-2923 (JNE/TNL), 2012 WL 5936055, at *1 (D. Minn. Nov. 27, 2012) (citing *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009)).

Given the allegations in the SAC, the Court has serious concerns about its federal subject-matter jurisdiction as to the LLC Defendants. Plaintiff's allegation that XPO Logistics has a "principal place of business . . . [in] Connecticut" fails to specify the citizenship of each of XPO Logistics's members. (SAC ¶ 5.) It is likewise insufficient for Plaintiff to allege that KLE Equipment "is a Wisconsin corporation sharing a principal place of business . . . [in] Wisconsin." (*Id.* ¶ 10.) The Court may not take Plaintiff at her

word that "complete diversity exists between the parties." (*Id.* ¶ 16.) To satisfy her burden of alleging diversity jurisdiction, Plaintiff must allege with specificity the citizenship of each LLC Defendant's members (and if applicable, each member's sub-members).

### 2.    Citizenship of Individuals

Defendant Michaels is an individual that Plaintiff alleges "is a *resident* of the State of Wisconsin." (*Id.* ¶ 12 (emphasis added).) Diversity jurisdiction requires that Plaintiff is not a *citizen* of the same state as any Defendant in this action. *See Owen Equip.*, 437 U.S. at 373. In this Circuit, alleging that a defendant is a "resident" of a state is not the same as alleging a defendant is a "citizen" of that state. *See Reece*, 760 F.3d at 778 (citations omitted) ("Because of this ambiguity in the word 'resident'—as compared to 'citizen' . . . —we cannot satisfy ourselves that diversity jurisdiction is proper based solely on an allegation a party is (or was) a 'resident' of a particular state.") Thus, Plaintiff's allegation that Mr. Michaels resides in Wisconsin is not pleaded with enough specificity to assure this Court that complete diversity exists. To satisfy her burden, Plaintiff must allege the citizenship of Mr. Michaels.

### 3.    Holding

When a pleading fails to adequately allege diversity jurisdiction, courts have the discretion to allow an amendment. *See* 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."); *see also Dubach v. Weitzel*, 135 F.3d 590, 593 (8th Cir. 1998). The Court will follow that path here. Therefore, when Plaintiff files, within fourteen days, her Third Amended Complaint, that Third Amended Complaint shall allege with specificity the citizenship of each party—

CASE 0:19-cv-02719-DSD-JFD   Doc. 186   Filed 03/23/22   Page 38 of 38

including the citizenship of the LLC Defendants and of Mr. Michaels—at the time that Plaintiff commenced this action. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 574–75 (2004) (citing *Conolly v. Taylor*, 27 U.S. 556, 565 (1829) (stating the longstanding principle that jurisdiction depends upon the citizenship of each party at the time that a plaintiff commences their suit)).

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Trina Russ's Motion for Leave to File a Third Amended Complaint to Add a Claim for Punitive Damages Against XPO Logistics, LLC (Dkt. No. 134) is **DENIED**;

2. Plaintiff's Motion for Leave to File a Third Amended Complaint to Add a Claim for Punitive Damages Against Ecklund Logistics, Inc. (Dkt. No. 138) is **GRANTED**; and

3. Plaintiff shall, **within fourteen days of the date of this Order**, file a Third Amended Complaint that adds her claim for punitive damages against Ecklund Logistics, Inc., and that alleges with specificity the citizenship of each party at the time that Plaintiff commenced this action.

Dated: March 23, 2022            *s/ John F. Docherty*
                                 JOHN F. DOCHERTY
                                 United States Magistrate Judge

38