UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CIVIL NO. 19-2719(DSD/JFD)

Trina Russ, individually and as
Trustee for the Heirs and Next of
Kin of Andrew Russ,

           Plaintiff,

v.                                               **ORDER**

XPO Logistics, LLC, Ecklund Logistics,
Inc., KLE Equipment Leasing, LLC, and
Shane Thomas Michaels,

           Defendants.


     Jacob R. Jagdfeld, Esq., Michael K. Johnson, Esq. and Johnson
     Becker, PLLC, 444 Cedar Street, Suite 1800, St. Paul, MN
     55101, counsel for plaintiff.

     Michael R. Moline, Esq. and Lommen Abdo, P.A., 1000
     International Centre, 920 Second Avenue South, Minneapolis,
     MN 55402, counsel for defendants Ecklund Logistics, LLC and
     KLE Equipment Leasing, LLC.

     Andrew R. Brown, Esq. and Reding & Pilney, LLC, 8661 Eagle
     Point Boulevard, Lake Elmo, MN 55042, counsel for defendant
     Shane Thomas Michaels.

     Gordon H. Hansmeier, Esq. and Rajkowski Hansmeier, Ltd., P.O.
     Box 1433, St. Cloud, MN 56302-1433, for defendant XPO
     Logistics, LLC.


     This matter is before the court upon defendant XPO Logistics'

motion for summary judgment, defendant KLE Equipment's motion for

summary judgment, and defendant Ecklund Logistics' partial motion

for summary judgment.  Based on a review of the file, record, and

proceedings herein, and for the following reasons, the court grants the motions in part.

## BACKGROUND

This dispute arises out of a fatal traffic accident involving a passenger vehicle and a commercial motor vehicle in Woodbury, Minnesota.

## I.   The Parties

XPO Logistics, LLC (XPO) is a North Carolina limited liability company with a single member - XPO Logistics, Inc., which is incorporated in Delaware and maintains its principal place of business in Connecticut.  3d Am. Compl. ¶ 5.  XPO is a freight broker that arranges the transportation of goods by connecting customers seeking to ship goods with motor carriers.  XPO Dep. at 23:7-10; 201:4-8; Moline Decl. Ex. 7, at 2.  During the relevant time period, XPO maintained approximately 35,000 motor carriers in its database.  XPO Dep. at 167:5-9.

Ecklund Logistics, Inc. (Ecklund) is a Wisconsin corporation that operates as a motor carrier and provides for-hire services under the operating authorities of the Interstate Commerce Commission and the United State Department of Transportation.  Hansmeier Aff. Ex. 3, at 4.  Ecklund is owned by Kirk Ecklund.  Ecklund Dep. 28:14-29:3.

KLE Equipment Leasing, LLC (KLE) is a Wisconsin limited liability company that purchases commercial motor vehicles and leases those vehicles to motor carriers. 3d Am. Compl. ¶ 10; Ecklund Dep. at 257:4-58:10. KLE is also owned by Kirk Ecklund, and it currently has no paid employees. Ecklund Dep. 28:14-29:3. Trenton Ecklund, Kirk Ecklund's son, serves as volunteer manager of KLE and handles some of the day-to-day operations of the business. Ecklund Dep. at 255:7-14; 256:7-22. Kirk Ecklund, however, holds decision-making authority for KLE. Id. at 253:11-14.

Shane Thomas Michaels is a citizen of Wisconsin and was driving the commercial motor vehicle during the accident. 3d Am. Compl. ¶ 12; Johnson Decl. Ex. 1, ¶ 2; Michaels Dep. at 56:10-16.

## II.  XPO's Relationship with Ecklund

At the time of the accident, Ecklund was one of the carriers in XPO's database. Jagdfeld Decl. Ex. 4. To select and then on-board carriers into its database, XPO uses two websites – the Federal Motor Carrier Safety Administration "Safety and Fitness Electronic Records System" (SAFER) and Carrier411. XPO Dep. at 27:24-28:11. Both databases provide safety information and reports for interstate motor carriers.[1] Id. at 153:22-54:1. XPO

---

[1] XPO reports that it reviews SAFER and Carrier411 information daily. XPO Dep. at 152:7-16.

also ensures that the carrier has adequate insurance coverage. Id. After XPO's review of Ecklund's information, it found no red flags and added Ecklund to its database. Id. at 151:4-8.

At the time of the events leading to this litigation, Ecklund had a "satisfactory" SAFER rating – the highest rating available. Id. 161:7-17. This SAFER rating is based on a carrier's compliance with the Federal Motor Carrier Safety Regulations. Ecklund received this rating on May 17, 2013, and has not been re-rated since that time. Id. In fact, despite its rating, Ecklund filed over one hundred insurance claims in the five years before the accident at issue in this case. Johnson Decl. Ex. M. These claims included 104 property damage claims, 44 collision claims, and 20 bodily injury claims.[2] Id. XPO did not, however, investigate or consider this information before or after on-boarding Ecklund into its database. XPO Dep. at 172:15-73:12.

When Ecklund joined XPO's database, the two parties executed a Motor Carrier Transportation Agreement (MCTA) that delineated their relationship. Johnson Decl. Ex. A. The MCTA identified XPO as a freight broker and Ecklund as a motor carrier acting as an independent contractor. Johnson Decl. Ex. A, at 2. The agreement also specified that no "act or omission of either party shall be construed for any purpose to express or imply a joint venture,

---

[2] Ecklund operated approximately 75 trucks and trailers during this time period.

4

partnership, principal/agent, fiduciary, or employer/employee relationship between the parties. Id. § 15.2. The MCTA further stated that Ecklund would have "exclusive supervision and control over the operations of [its employees] as well as all vehicles and equipment used to perform its transportation services." Id. Ecklund would be "responsible for the acts and omissions" of its employees and be "solely responsible for paying such persons for services or materials." Id.

The MCTA did, however, require Ecklund to meet certain requirements and expectations. For example, Ecklund was prohibited from sub-brokering any load it accepted from XPO. Id. § 1.4. XPO also required Ecklund to notify it of any incidents affecting the transportation of loads. Id. § 4.2. Ecklund was required to "seek continuously to improve" its safety ratings and to provide XPO with a "corrective action plan to address any safety or safety rating issues." Id. § 6.2. Ecklund was also required to notify XPO immediately if it received a conditional or unsatisfactory safety rating. Id. XPO prescribed certain security procedures, such as inspecting trailers prior to loading, rejecting any equipment not in good condition to transport cargo, and documenting all inspections, among others. Id. § 6.1. The MCTA specified that Ecklund would be "solely responsible for supplying, transporting and maintaining all equipment necessary" to carry out its obligations, but it also required that Ecklund's

drivers be fully trained, screened by a criminal background check, complete substance abuse testing procedures, and conduct themselves courteously and professionally." Id. §§ 7.1, 7.3.

Additionally, the MCTA required Ecklund to obtain $1,000,000 per occurrence of commercial general liability insurance, $1,000,000 per accident of automobile liability insurance, and $250,000 of broad form cargo liability insurance. Id. § 9.1. The MCTA required that XPO be named as an additional insured. Id. § 9.3. Finally, the MCTA included an indemnification clause, which stated that Ecklund "shall be liable for, and shall defend, indemnify, and hold harmless [XPO] ... from all claims, demands, costs, damages (including special, indirect or consequential damages), losses, liabilities (including reasonable attorneys', accountants, and experts' fees and disbursements and other costs of defense, investigation and settlement ..., judgments, penalties, fines and others amounts ... relating to or arising out of: (a) injury to persons (including injury resulting in death) and damage to property arising out of or in connection with the transportation services performed by [Ecklund]." Id. § 10.1. It clarified that Ecklund "shall not be obligated to indemnify [XPO] to the limited extent that the Claim directly results from the negligence or willful misconduct of [XPO]." Id. Either party could terminate the MCTA with thirty days written notice, and XPO

6

could also terminate immediately if certain events occurred.  Id. §§ 2.1, 2.2.

## III.  Ecklund's Relationship with KLE

As already noted, Kirk Ecklund owns both Ecklund and KLE. Ecklund Dep. at 28:14-29:3.  KLE operates out of the same office as Ecklund.  Id. at 112:10-16.  The only company that KLE currently leases equipment to is Ecklund.  Id. at 257:23-58:10.  KLE does not advertise its business or services publicly.  Id. at 282:1-5.

Before leasing its equipment to a motor carrier, KLE does not investigate any aspect of a motor carrier's operations.  Trenton Ecklund Dep. at 50:17-51:23.  KLE does not require that a carrier meet any standards or requirements to lease its equipment.  Id. More specifically, KLE does not evaluate a company's safety performance, financial history, or hiring or employment practices. Id. at 50:17-53:19.  KLE similarly does not monitor its equipment once it is leased to a carrier.  Id. at 59:5-18.  Accordingly, KLE did not investigate Ecklund or require it to meet any standards before leasing it equipment.  Id. at 50:17-51:23.

## IV.  Ecklund's Hiring of Michaels

Prior to joining Ecklund, Michaels graduated from Diesel Truck Driving School in 2016, obtained his commercial driver's license (CDL), and worked for four different companies driving commercial vehicles.  Id. at 12:24-14:9; 40:6-56:10.  Immediately before joining Ecklund, Michaels had been working for Anderson

7

Trucking Service (ATS).   Jagdfeld Decl. Ex. 15, at 4.   On his
Ecklund employment application, Michaels listed his reason for
leaving ATS as "Lies" and requested that Ecklund not contact ATS.
Id.   Michaels listed Schneider National as his employer before
ATS.   Id.   He listed his reason for leaving Schneider as "Things
changed and drivers don't matter to office people."   Id. at 5.
Additionally, Michaels listed Redline LLC as his first motor
carrier employer and indicated he had been terminated after his
truck rolled away.   Id. at 6.

Along with his application, Michaels signed an authorization
that allowed Ecklund to obtain "information about names and dates
of previous employers, reasons for termination of employment, work
experience, accidents, academic history, professional credentials
and other information."   Id. at 17-19.   Ecklund also could have
requested additional information under federal law, including
"personal interviews, telephone interviews, letters, or any method
for investigating that the carrier deems appropriate."   49 C.F.R.
391.23(c)(2).   Ecklund, however, did not follow up with his
previous employers[3] about any of these items in Michaels's

---

[3] Taylor Krueger, Ecklund's Safety Director, did ask Michaels
about some of his application answers but cannot recall Michaels's
responses.

application.[4]  Krueger Dep. at 114:3-16:4.  Instead, Ecklund viewed Michaels's application as having "no red flags."  Krueger Dep. at 118:15; 122:3-4; 166:12-16; 172:21-73:8

## V.    The Accident

In July 2019, Beumer Group, a frequent customer of XPO, contacted XPO to transport a load of cargo.  Jagdfeld Decl. Ex. 1. XPO posted the job's availability to a third-party site, and Ecklund saw the posting and contacted XPO.  XPO Dep. at 24:20-24. One other motor carrier also contacted XPO about the job, and XPO analyzed the bids to determine which would be chosen.  Id. at 110:7-11:3.  When selecting a carrier for a particular load, XPO considers several factors, including price, service, and ability to meet the requirements of the shipper.  Id. at 111:4-13.  A motor carrier's ability to deliver a load on time, however, is a particularly important factor for XPO.  Id. at 111:20-12:20. Ultimately, XPO selected Ecklund to transport the load.  Id. at 110:7-14.

Ecklund then assigned the load to Michaels.  Michaels Dep. at 116:4-22.  Michaels had just been hired, and June 12, 2019, was his first day on the job.  Id. at 101:5-8.  In fact, the Beumer

---

[4] Ecklund did contact Michaels's previous employers to inquire about his compliance with drug and alcohol testing regulations. Krueger Dep. at 114:3-16:4.

Group load, assigned to Ecklund by XPO, was Michaels's first job as an Ecklund employee.  Id. at 115:20-23.

According to the load confirmation, the Beumer Group load was to be transported from Waupaca, Wisconsin, to Thief River Falls, Minnesota.  Jagdfeld Decl. Ex. 1.  The load was to be picked up between 7:00 a.m. and 3:00 p.m. on June 12 and delivered between 8:00 a.m. and 9:00 a.m. on June 13.  Id.  The distance between Waupaca, Wisconsin, to Thief River Falls, Minnesota, is approximately 537 miles.  Krueger Decl. Ex. 1, ¶ 71.  This distance would take a passenger vehicle roughly eight to ten hours to drive safely, and it could take a commercial motor vehicle closer to eleven hours.[5]  Id.

On July 12, Michaels went on duty at approximately 9:00 a.m. Jagdfeld Decl. Ex. 2.  After a delay in which his truck needed minor repairs, Michaels left Waupaca with the load at 2:34 p.m.[6] Under federal regulations, Michaels would be required to stop for a ten hour break no later than 11:00 p.m.  Krueger Decl. Ex. 1, ¶ 69.  According to his driver logs, Michaels drove – with short breaks – for several hours until stopping for his ten-hour

---

[5] XPO uses a 47 mile per hour industry standard to calculate the time it will take to haul commercial freight.  XPO Dep. at 236:10-19.

[6] There is a discrepancy in Michaels's departure time between Ecklund's driver logs and XPO's separate logs.  XPO's logs indicate that Michaels left Waupaca at 1:00 p.m. on July 12.  Jagdfeld Decl. Ex. 4, at 2.

overnight break at 8:00 p.m. in Hudson, Wisconsin.  Jagdfeld Decl. Ex. 2; Krueger Decl. Ex. 1, ¶¶ 80-82.

Federal regulations permit a driver to be on duty for up to fourteen hours but limit a driver to eleven hours of driving in those fourteen hours.  Jagdfeld Decl. Ex. 10.  After the fourteen-hour limit, a driver must take a ten-hour break.  Id.  Thus, because the needed repairs delayed Michaels's departure, he could not make it to Thief River Falls by the delivery window, unless he violated federal hours-of-service regulations or by speeding.

Before he stopped for the night, Michaels realized that he would not make the 8:00 a.m. to 9:00 a.m. delivery time the next day, so he initiated the process to reschedule the delivery window. Krueger Decl. Ex. 1, ¶ 83.  To do so, he sent a message to Ecklund that said "Im (sic) going to be late on this load please call me." Jagdfeld Decl. Ex. 5.  Ecklund is not set up to respond to these types of messages after hours, however.  Krueger Decl. Ex. 1, ¶ 87. Instead, Ecklund's dispatchers typically respond to such requests at the beginning of the next business day.  Id.  Because of this, Michaels did not hear back from Ecklund that night or by the time he began driving the next morning.  Michaels Dep. at 146:2-12.

According to Ecklund, however, deliveries are not time-critical.  Kruger Decl. Ex. 1, ¶ 88.  Instead, the delivery windows are set so that the customer has a team available to unload the cargo.  Id.  If a driver is behind his or her deadline, the delay

simply needs to be communicated to Ecklund and the customer so that the customer can reschedule the unloading team. Id. Thus, Ecklund maintains that Michaels had no reason to be concerned that he was behind schedule or that he would not make his scheduled delivery window. Michaels also claims that he had no concerns about running late. Michaels Dep. 197:14-17; 207:17-23.

Ecklund's driver handbook, however, states that "If driver is not at shipper or receiver by the time sent in the dispatch for that load, the driver will be considered late." Jagdfeld Decl. Ex. 13, at 14. The handbook also states that a driver's pay can be deducted $0.01 per mile if late and that lateness to a customer delivery is "considered to be misconduct and grounds for termination." Id. at 42. It does not appear that Ecklund told Michaels that he would not face penalties for a late delivery of the Beumer Group load.

The next morning, July 13, Michaels went back on duty at 6:19 a.m. and began driving at 6:35 a.m. Jagdfeld Decl. Ex. 2. Michaels soon crossed over into Minnesota, traveling west on Interstate 94. Jagdfeld Decl. Ex. 7. At 6:55 a.m., Michaels - still driving on Interstate 94 - approached a section of roadway where vehicles join west-bound traffic via an on-ramp. Id. at 3. The on-ramp joins the other four lanes of traffic and becomes a fifth lane. Id. As Michaels came up on this area, traffic in the far-right lane had slowed as vehicles attempted to merge onto the interstate.

12

Id. at 17.  Michaels then attempted to change lanes and enter the far-right lane of traffic.  Id. at 21.  As he did so, Michaels checked his mirrors, thus taking his eyes momentarily off of the road and traffic in front of him.  Id.  After checking his mirrors, Michaels looked up to see the traffic in front of him had slowed. Id.  With no time to stop, Michaels crashed into the rear of a white car directly in front of him.  Id.  It does not appear that Michaels attempted to brake or swerve to avoid the collision until impact or immediately before impact.  Id. at 20.

The car Michaels collided with was driven by Andrew Russ. Because of the force of impact, Russ's car rotated and then struck the vehicle immediately in front of his.  Id. at 12.  Russ was transported to a nearby hospital but died of his injuries soon after arriving.  Id. at 2.

At the scene, Michaels told officers that he had not been distracted, and officers reported that Michaels did not appear impaired.  Johnson 3d Decl. Ex. 1, at 5.  Michaels explained to the officers that a white car had been in the lane to his left before he checked his mirrors, and when he looked back at the road, he saw a white vehicle suddenly in front of him.  Id. at 8-9. Because of this, Michaels believed the white vehicle had cut him off and then slowed in front of him, not leaving him enough time to brake or swerve to avoid a collision.  Id.  A later accident report, however, found that Russ's white car had been in the right

lane for at least five seconds prior to the crash, so it did not
dart in front of Michaels as he had told officers.[7]  Jagdfeld Decl.
Ex. 7, at 21.  Instead, the crash report found that the crash had
been primarily caused because Michaels was "distracted in some
manner prior to the crash and failed to perceive the slower moving
traffic ahead."  Id.  When officers asked Michaels if he had a
deadline to get to Thief River Falls, he responded "Yeah, 8:00,
which ain't gonna happen."  Id. at 12.  Officers then said, "Eight
a.m.  Okay, so you were running late?"  Id.  Michaels answered,
"Very."  Id.

Plaintiff Trina Russ, the surviving spouse of Andrew Russ and
trustee for the heirs and next of kin of Andrew Russ, filed this
complaint against defendants.[8]  As appointed trustee, plaintiff
brings claims against defendants for negligence, various forms of
vicarious liability, joint enterprise liability, joint venture
liability, alter ego liability, negligent hiring, negligent
retention, negligent supervision, negligent entrustment, and
violations of the FMCSR.  Additionally, plaintiff also brings a

---

[7]  It is not clear if Michaels saw a different white car to
his left prior to the crash and, after then crashing into a white
car, simply believed that the two cars must have been the same.
See Johnson 3d Decl. Ex. 1, at 30-32.

[8]  For clarity, the court will refer to Andrew Russ as "Russ"
and Trina Russ as "plaintiff."

loss of consortium claim on her own behalf.  Plaintiff seeks actual and punitive damages.

Ecklund moves for partial summary judgment, on all claims except for plaintiff's negligence and vicarious liability claim. KLE moves for summary judgment on all claims against it.  XPO also moves for summary judgment on all claims, and it seeks an order finding Ecklund breached its contract with XPO and compelling Ecklund to defend and indemnify it.

## DISCUSSION

The parties dispute which state law should apply to some of the issues – Minnesota or Wisconsin.  Thus, the court begins with a choice-of-law analysis.

## I.   Choice of Law

"In a diversity case, a federal court applies the choice of law rules of the forum state."  Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1393 (8th Cir. 1997). Minnesota courts initially consider two threshold questions.  The first is "whether the choice of one state's law over another's creates an actual conflict."  Jepson v. Gen. Cas. Co. of Wisc., 513 N.W.2d 467, 469 (Minn. 1994).  The second is "whether the law of both states can be constitutionally applied" - that is, whether each state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law

is neither arbitrary nor fundamentally unfair." Id. at 469 (citation and internal quotation marks omitted).

If both threshold questions can be answered affirmatively, a court then applies five factors to determine which state's law to apply: "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." Id. at 470 (citation omitted).

The first factor, predictability of result, "addresses whether the choice of law was predictable before the time of the transaction or event giving rise to the cause of action." Danielson v. Nat'l Supply Co., 670 N.W.2d 1, 7 (Minn Ct. App. 2003).

The second factor, maintenance of interstate order, "addresses whether the application of Minnesota law would manifest disrespect for [other states] or impede the interstate movement of people and goods." Id. (citation omitted).

The third factor, simplification of judicial task, "is not particularly relevant where the competing laws are straightforward and the courts' interpretations of them are adequate to provide the guidance a trial court might wish to have." Id. at 8 (citation and internal quotation marks omitted).

16

The fourth factor, advancement of the forum's governmental interest, "goes to which law would most effectively advance a significant interest of the forum state."   Id. (citation and internal quotation marks omitted).

Finally, the fifth factor, application of the better rule of law, is "the rule that made good socio-economic sense for the time when the court speaks."   Id. at 9 (citation and internal quotation marks omitted).   This factor should be addressed when the other four factors are inconclusive.   Id.

In tort cases, the first three factors play a minimal role. See Boatwright v. Budak, 625 N.W.2d 483, 489 (Minn. Ct. App. 2001) ("only the last two elements of the five-point methodology for resolving conflict questions are relevant in tort cases."). Predictability of result largely does not apply "because of the unplanned nature of ... accidents."   Jepson, 513 N.W.2d at 470. The maintenance of interstate order factor is "generally satisfied as long as the state whose law are purportedly in conflict has sufficient contacts with and interest in the facts and issues being litigated."   Myers v. Gov't Emps. Ins. Co., 225 N.W.2d 238, 242 (Minn. 1974).

Finally, Minnesota courts decide choice-of-law questions on "an issue-by-issue, and not case-by-case, basis."   Zaretsky v. Molecular Biosystems, Inc., 464 N.W.2d 546, 548 (Minn. Ct. App.

1990).   Accordingly, the court will make the choice of law determination separately for each issue.

## II.  XPO as Motor Carrier

In Count III, plaintiff brings claims against XPO as a motor carrier.  XPO moved for summary judgment on this claim, arguing that it operates solely as a broker and not as a motor carrier. Plaintiff does not oppose, and the court grants summary judgment on this claim.

## III. Violations of FMCSR

Count XI alleges that XPO, Ecklund, KLE, and Michaels violated the Federal Motor Carrier Safety Regulations (FMCSR).  49 C.F.R. 390.13.  Defendants move for summary judgment on this claim, arguing that there is no private right of action under the FMCSR. Plaintiff counters, arguing that violations of the FMCSR establish negligence per se.

The court finds that no private right of action exists under the FMCSR.  See Schramm v. Foster, 341 F. Supp. 2d 536, 547 (D. Md. 2004); cf. Harris v. FedEx Nat. LTL, Inc., 760 F.3d 780, 784 n.2 (8th Cir. 2014).  Accordingly, summary judgment on Count XI is granted.  The court notes, however, that violations of safety regulations may be used as evidence of negligence for plaintiff's other claims.

**IV.  Claims Against KLE**

Russ's claims against KLE hinge on two separate theories. The first theory, which asserts vicarious liability, is that KLE is the alter ego of Ecklund and thus is liable for Ecklund's, and Michaels's, negligence.  The second theory, which asserts direct liability, is the KLE negligently entrusted its equipment to Ecklund.

**A.  Alter Ego**

To start, the parties dispute whether Minnesota or Wisconsin law applies.  The court first notes that although the state laws are rooted in the same principles, the tests are articulated differently and could be applied differently - thus resulting in a conflict of law.  The court also notes that both states have sufficient contacts so that the laws of either state could be constitutionally applied.

Moving to the second part of the choice-of-law inquiry, the court finds that Minnesota courts apply the internal affairs doctrine.  Rupp v. Thompson, No. C5-03-347, 2004 WL 3563775, at *3 (Minn. Dist. Ct. Mar. 17, 2004).  The internal affairs doctrine requires the application of the law of a corporation's state of incorporation.  ASI, Inc. v. Aquawood, LLC, No. 19-763, 2022 WL 980398, at *11 (D. Minn. Mar. 31, 2022).  This rule recognizes "that only one State should have the authority to regulate a corporation's internal affairs – matters peculiar to the

19

relationships among or between the corporation and its current officers, directors, and shareholders – because otherwise a corporation could be faced with conflicting demands." Edgar v. MITE Corp., 457 U.S. 624, 645 (1982).

"[D]etermining whether an entity is an alter ego entails a detailed analysis of a corporation's internal affairs." ASI, Inc., 2022 WL 980398, at *11. Accordingly, courts consistently find that "alter ego claims are governed by the internal affairs doctrine." Matson Logistics, LLC v. Smiens, No. 12-400, 2012 WL 2005607, at *6 (D. Minn. June 5, 2012) (collecting cases). Therefore, because KLE and Ecklund are citizens of Wisconsin, the court will apply Wisconsin law.

The alter ego doctrine is "typically employed to pierce the corporate veil or disregard a corporate fiction to reach a controlling entity, such as a shareholder or parent corporation."[9] Taurus IP v. DaimlerChrysler Corp., 519 F. Supp. 2d 905, 918-19 (W.D. Wis. 2007) (citation omitted). "Once the corporate veil has been pierced to reach an entity for acts done by a controlling or

---

[9] KLE argues that the alter ego doctrine can only apply between a business entity and an individual owner or shareholder and cannot apply to two business entities. The doctrine, however, can apply when a company exerts the type of control over another company that justifies piercing the corporate veil in other contexts. See Taurus IP, 519 F. Supp. 2d at 919 (alter ego doctrine is "typically employed to pierce the corporate veil or disregard a corporate fiction to reach a controlling entity, such as a shareholder or parent corporation.") (emphasis added).

controlled entity, the court may attribute those acts ... to the entity behind the veil." Id. at 919 (citation omitted).

In Wisconsin, the alter ego doctrine requires proof of three elements:

> (1)  Control, not merely majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or evidence of its own;
>
> (2)  Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3)  The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Goeben v. DCS Dev., Inc., No. 2012AP1618, 2013 WL 3242145, at *2-3 (Wis. Ct. App. June 28, 2013) (citation omitted).

Plaintiff argues that KLE operated as Ecklund's alter ego under this standard. Plaintiff contends that Ecklund completely dominated the business operations of KLE because Kirk Ecklund, the owner of both Ecklund and KLE, held decision-making authority for both companies. Additionally, Ecklund represented KLE's sole customer, so Ecklund dominated KLE's revenue stream. Plaintiff also notes that KLE has no employees other than Kirk Ecklund and

his son, Trenton Ecklund.[10]  Finally, plaintiff appears to argue that the arrangement between Ecklund and KLE creates an injustice because it shields assets from Ecklund's negligent operation of its motor carrier business.

These arguments, however, are insufficient to create a triable issue.  Plaintiff has not produced facts that show that Ecklund dominated KLE's day-to-day operations.  There are no facts to show that KLE was undercapitalized or that KLE and Ecklund co-mingled assets or finances.  There are no facts showing that KLE disregarded corporate formalities.  Instead, the facts showing that KLE and Ecklund share common ownership and that KLE was likely formed to benefit Ecklund are insufficient to create a triable issue on plaintiff's alter ego theory.  Accordingly, summary judgment on this claim is granted.

B.  **Negligent Entrustment**

Plaintiff also alleges that KLE negligently entrusted its equipment to Ecklund.  Negligent entrustment "impose[s] direct liability on '[o]ne who supplies ... a chattel for the use of another whom the supplier knows or has reason to know to be likely because of [the other's] youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm.'"

---

[10] Trenton Ecklund is the "volunteer manager," and he does not receive compensation for his work at KLE.  Ecklund Dep. at 11:22-12:16.

<u>Soto v. Shealey</u>, 331 F. Supp. 3d 879, 887 (D. Minn. 2018) (quoting

<u>Axelson v. Williamson</u>, 324 N.W.2d 241, 243-44 (Minn. 1982)).  "In

the automobile-accident context, 'negligent entrustment has been

defined as a separate wrongful act when the negligence of the

driver is reasonably foreseeable and the entrustor fails in the

duty to take steps to prevent operation of the vehicle by the

driver.'"  <u>Id.</u> (quoting <u>Lim v. Interstate Sys. Steel Div., Inc.</u>,

435 N.W.2d 830, 832 (Minn. Ct. App. 1989)).

KLE argues first that plaintiff's negligence claims are

barred by the Graves Amendment.  KLE also contends that it had no

notice that Ecklund posed an unreasonable risk to others and thus

cannot be liable for negligent entrustment.

The Graves Amendment provides that:

An owner of a motor vehicle that rents or leases the
vehicle to a person (or an affiliate of the owner) shall
not be liable under the law of any State or political
subdivision thereof, by reason of being the owner of the
vehicle (or an affiliate of the owner), for harm to
person or property that results or arises out of the
use, operation, or possession of the vehicle during the
period of the rental or lease, if –

(1)   The owner (or an affiliate of the owner) is engaged
      in the trade or business of renting or leasing motor
      vehicles; and

(2)   There is no negligence or criminal wrongdoing on
      the part of the owner (or an affiliate of the
      owner).

49 U.S.C. § 30106(a).

The court agrees that under the plain language of the Graves Amendment, KLE cannot be vicariously liable for the acts of Ecklund or Michaels.   It can, however, be directly liable for its own negligence or criminal wrongdoing.   Here, plaintiff asserts that KLE is directly liable for its own negligence in allowing Ecklund to lease its equipment.   Thus, the question becomes whether KLE knew or should have known that Ecklund posed an unreasonable danger to others in its operations.

Plaintiff argues that KLE was negligent because it did not employ any safety standards in selecting its lessees.   In fact, KLE admits that it did not conduct any due diligence into its lessees before agreeing to lease its equipment.   Further, plaintiff argues that KLE was on notice of Ecklund's past collisions, extensive insurance claims, poor hiring practices, and financial instability.[11]   In contrast, KLE argues that Ecklund was a registered motor carrier that was authorized to deliver interstate loads country-wide and thus there were no indications that Ecklund posed an unreasonable danger.

Here, the court finds that there is a factual dispute sufficient to deny summary judgment.   As plaintiff notes, KLE knew of Ecklund's business practices and safety record due to the dual ownership stakes of Kirk Ecklund.   Further, there are facts in the

---

[11] Plaintiff notes that Kirk Ecklund owns both KLE and Ecklund and thus his knowledge of Ecklund's history can be imputed to KLE.

record showing that Ecklund had previously been involved in accidents and had submitted numerous insurance claims. KLE offers no evidence to dispute these facts or to show that its safety record is standard in the industry. Therefore, whether the facts offered by plaintiff show that Ecklund posed an unreasonable risk to public safety is a question properly left to the factfinder.

**V.   Negligence**

Next, plaintiff brings a claim for negligence against all defendants. Ecklund and Michaels did not move for summary judgment on this issue. KLE and XPO move for summary judgment, both arguing that there is no basis for direct liability.

**A.   KLE's Negligence Liability**

As already discussed, KLE argues that it is not Ecklund's alter ego and thus is not responsible for its acts or the acts of its employees. Based on that argument, KLE's position is that it had no role in the events leading up to or causing the crash, and it therefore cannot be liable. More specifically, KLE argues that cannot be held liable for acts of its lessees under the Graves Amendment.

As already discussed, KLE is not the alter ego of Ecklund and thus cannot be liable for Ecklund's independent acts. The Graves Amendment bars claims against the owner of a leased vehicle for harms arising out of the "use, operation, or possession of the vehicle during the period of the rental or lease." 49 U.S.C.

§ 30106(a).  The court finds that the Graves Amendment applies to this claim and preempts any state law that would impose liability. See Meyer v. Nwokedi, 777 N.W.2d 218 (Minn. 2010).  Accordingly, summary judgment is granted in favor of KLE on this claim.

**B.   XPO's Negligence Liability**

As to her negligence claim against XPO, it appears that plaintiff's argument is that XPO is directly liable for the crash because it aided and abetted tortious conduct.[12]  Under Minnesota law, "[a]iding and abetting is not an independent tort, but a theory of liability under which a party may be held jointly and severally liable for the underlying tort."   Zayed v. Associated Bank, N.A., 913 F.3d 709, 714 (8th Cir. 2019) (citations omitted). Aiding and abetting has three elements:

> (1)  the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach.

Witzman v. Lerhman, Lehrman & Flom, 601 N.W.2d 179, 187 (Minn. 1999) (citations omitted).

---

[12] It is not entirely clear whether Count I alleges that XPO is directly liable under an aiding and abetting theory or whether it alleges a vicarious liability theory.  For clarity, the court addresses the aiding and abetting theory, a direct liability theory, under Count I and the principal-agent theory, a vicarious liability theory, under Count IV.

Plaintiff argues that all three factors are met here. First, Michaels committed a tort that caused an injury when he crashed into Russ's car. Second, XPO created a schedule that it knew would require Michaels to drive unsafely. Third, XPO encouraged Ecklund and Michaels to meet the delivery window that could only be met through unsafe driving practices and did not adjust the delivery window despite knowing that it created incentives to drive recklessly.

In contrast, XPO argues that the second and third elements of an aiding and abetting claim are not met. XPO argues that the facts show that Michaels was not motivated by the delivery window, XPO was not enforcing the delivery time, and XPO demonstrated willingness to modify the delivery time. Therefore, according to XPO, it did not know that Michaels would breach his duty, nor did it substantially assist or encourage a breach of duty.

The court agrees with XPO. Specifically, the court finds that the third element is not met. That is, plaintiff has not offered sufficient facts to show that XPO substantially assisted or encouraged the primary tortfeasor. XPO did not employ or supervise Michaels, the primary tortfeasor. XPO did not communicate with Michaels. XPO's policies did not apply directly to Michaels, nor did XPO have any ability to impose penalties on Michaels. Thus, XPO did not substantially assist or encourage

27

Michaels to engage in tortious behavior, and the court grants XPO's motion for summary judgment.

## VI.  Agency Liability

Count IV alleges that XPO is vicariously liable for the crash because Ecklund, and by extension Michaels, operated as XPO's agent.   XPO, however, argues that Ecklund operated as an independent contractor, and as a result, XPO cannot be vicariously liable for its acts.

An employer is vicariously liable for its employee's negligent acts committed in the scope and course of employment, but it is not vicariously liable for negligent acts committed by its independent contractors.  Compare Lange v. Nat'l Biscuit Co., 211 N.W.2d 783, 784 (Minn. 1973), with Conover v. N. States Power Co., 313 N.W.2d 397, 407 (Minn. 1981).

Minnesota courts consider five factors to determine whether a person is an employee or an independent contractor: "(1) The right to control the means and manner of performance; (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done; and (5) the right of the employer to discharge."  Guhlke v. Roberts Truck Lines, 128 N.W.2d 324, 326 (Minn. 1964).  The "right of control over the means but not the results of the tortfeasor's conduct remains 'the most important single element' in determining whether the relationship demonstrates employment or independent contracting."  Ronning v.

28

Martin, No. A10-218, 2010 WL 5154952, at *3 (Minn. Ct. App. Dec. 21, 2010) (citations omitted).

Here, most of the relevant evidence supports an independent contractor determination.  There is no evidence that XPO specified the type or condition of the truck that Ecklund was required to use.  Ecklund was free to determine which driver would be assigned to the job.  Although XPO provided route information, it was not mandatory, and Michaels was free to choose whichever route he preferred.  There is no indication that XPO instructed Ecklund or Michaels how to drive safely and efficiently.  The only control XPO exerted was communicating the type of load and the delivery window.  In sum, XPO did not control the means or manner of Ecklund's performance.

Further, the other factors equally suggest an independent contractor relationship.  Ecklund received compensation on a per-job basis and did not receive payment by the hour or a general salary.  XPO did not supply materials or tools for Ecklund to use in transporting the load.  Ecklund was responsible for gas, maintenance, licensing, and insurance of its vehicles.  Although XPO's contract with Ecklund specified certain safety measures Ecklund's drivers should take to protect each load, XPO did not have any real control over the premises on which the work was done.

It did not control Ecklund's trucks or its facilities.[13]  Finally, XPO could not terminate its agreement with Ecklund at will; it could only terminate with 30 days' written notice for any reason or immediately with cause.  These facts support the conclusion that Ecklund was an independent contractor rather than an employee.  Based on this finding, XPO is not vicariously liable for Ecklund's, or Michaels's, allegedly negligent conduct.  Accordingly, summary judgment on this claim is granted.

## VII. Joint Enterprise and Joint Venture

Count V and Count VI allege that XPO, Ecklund, and KLE are all liable because they engaged in either a joint enterprise or joint venture.  Here, again, the court begins with a choice of law analysis.

Wisconsin law does not recognize separate joint venture and joint enterprise claims.  See Edlebeck v. Hooten, 121 N.W.2d 240, 243 (Wis. 1963).  Thus, under Wisconsin law, four elements must be present to establish a joint venture: "(1) contribution of money or services by each of the parties; (2) joint proprietorship and mutual control over the subject matter of the venture; (3) an

---

[13] Plaintiff argues that XPO retained inspection and audit rights over Ecklund's facilities and thus had the legal right to control.  These rights, however, are informational rights that allow XPO to assess whether Ecklund continued to meet its contractual obligations.  These rights, however, did not empower XPO to unilaterally make changes in Ecklund's facilities or its operations.

agreement to share profits; and (4) an express or implied contract establishing the relationship." Kangas v. Perry, 620 N.W.2d 429, 433 (Wis. Ct. App. 2000) (citation and internal quotation marks omitted).

Under Minnesota law, a joint enterprise has two elements: "(1) a mutual understanding for a common purpose, and (2) a right to voice in the direction and control of the means used to carry out the common purpose." Mellett v. Fairview Health Servs., 634 N.W.2d 421, 424 (Minn. 2001) (citation and internal quotation marks omitted). A joint venture, however, has four elements: "(1) contribution – combining either money, property, time, or skill in a common undertaking; (2) joint proprietorship and control – the parties having a proprietary interest and a right of control over the subject matter; (3) sharing of profits – but not necessarily of losses; and (4) contract – either express or implied." Hansen v. St. Paul Metro Treatment Ctr., Inc., 609 N.W.2d 625, 628 (Minn. Ct. App. 2000) (citation and internal quotation marks omitted).

Here, the court will apply Minnesota law. First, there is a conflict because Minnesota law treats the two related concepts more expansively. Second, both states have sufficient contacts to permit the constitutional application of either state law. Because both threshold questions are met, the court considers the five factors. Most of the factors are not dispositive, because they can weigh in favor of either state. The fourth factor, advancement

of the forum's governmental interest, however, decides the issue. Minnesota has a strong interest in compensating victims of tortious conduct that occurs within its borders. Further, Minnesota has an interest in protecting its citizens from individuals or companies that work together to cause harm within its borders. Thus, the court applies Minnesota law.

### A.   Joint Enterprise

The two elements to a joint enterprise are: "(1) a mutual understanding for a common purpose, and (2) a right to voice in the direction and control of the means used to carry out the common purpose." Mellett, 634 N.W.2d at 424. A joint enterprise theory "does not generally apply to affiliated companies and business relationships." Johnson v. Charps Welding & Fabricating, Inc., No. 14-cv-2081, 2018 WL 3978111, at *3 (D. Minn. Aug. 20, 2018). "Joint venture – not joint enterprise – 'arises in business transactions.'" Id. (citing Delgado v. Lohmar, 289 N.W.2d 479, 482 n.2 (Minn. 1979)). Joint enterprises typically arise "for a more limited purpose, [or] for a more limited time." Weber ex rel. Sanft v. Goetzke, 371 N.W.2d 611, 615 (Minn. Ct. App. 1985).

Plaintiff alleges that XPO, Ecklund, KLE, and Michaels all engaged in a joint enterprise. To start, as already discussed, KLE is not Ecklund's alter ego and thus can only be implicated by its own acts. Further, KLE's involvement, leasing trucking equipment to Ecklund, does not establish that it had a common

32

purpose with any other defendant.  Thus, KLE's motion for summary judgment on this claim is granted.

Next, XPO and Ecklund also argue that they were not engaged in a joint enterprise because they did not have the requisite control over the other.  Arguably, XPO and Ecklund had a common purpose – delivering the load to its destination safely and on time.  The question is then whether the second element is met – that XPO and Ecklund had a right to voice in the direction and control of the means used to carry out the common purpose.

To establish the control element, the plaintiff must show that each participant had an "equal right to direct and govern the movements and conduct of every other participant." Spannaus v. Otolaryngology Clinic, 242 N.W.2d 594, 597 (Minn. 1976).  It is the right to control, not the actual exercise of control, that determines liability.  Krengel v. Midwest Automatic Photo, Inc., 203 N.W.2d 841, 846 (Minn. 1973).

Plaintiff argues that both XPO and Ecklund had a mutual voice in the direction and control of the means to carry out their mutual purpose.  For example, plaintiff claims that XPO set pick-up and delivery times, dictated the trailers that Ecklund used, required communication throughout the trip, instructed Ecklund on where to park the truck, required specific insurance coverage, and reserved the right to inspect Ecklund's financial records and facilities. In contrast, XPO argues that Ecklund retained all decision-making

authority related to the delivery of the load.  Even though XPO admits that it communicated delivery instructions, it claims that this information simply communicates customer expectations.

The court agrees with XPO.  As in the agency context, XPO did not exert significant control over the means Ecklund used to transport the load.  XPO certainly communicated the parameters of the job.  It also required the motor carriers with which it worked to meet certain expectations – both in how they conducted their business and in how they performed work that XPO assigned to them.  Despite this, XPO did not wield control over Ecklund's performance of the job.  Ecklund assigned Michaels to the job without input from XPO.  Michaels selected the route without input from XPO.  Accordingly, the second element of a joint enterprise claim is not met, and summary judgment on this claim is granted.

**B.   Joint Venture**

A joint venture has four elements: "(1) contribution-combining either money, property, time, or skill in a common undertaking; (2) joint proprietorship and control – the parties having a proprietary interest and a right of control over the subject matter; (3) sharing of profits – but not necessarily of losses; and (4) contract – either express or implied."  Hansen, 609 N.W.2d at 628 (citation and internal quotation marks omitted).

As discussed, KLE did not exercise control over Ecklund's performance of the job, so the joint venture claim against it

fails.  Additionally, XPO did not exert sufficient control over ECklund's performance to meet the second element.  Accordingly, summary judgment motion on this claim is also granted.

**VIII. Negligent Hiring, Retention, and Supervision**

Both Count VIII and Count X allege negligent hiring, retention, and supervision.  Because the claims focus on different relationships and acts, the court will address each claim separately.

**A.   Ecklund's Hiring of Michaels**

For Count VIII, plaintiff contends that Ecklund, and by extension XPO and KLE, negligently hired, retained, and supervised Michaels.  To start, the court again conducts a choice of law analysis.  First, there is a conflict between Wisconsin and Minnesota law because Wisconsin does not permit claims against an employer for negligent hiring, retention, and supervision when the parties agree that an employee was acting within the scope of employment during the allegedly negligent act.  See Davis v. Macey, 901 F. Supp. 2d 1107, 1112 (N.D. Ind. 2012).  Minnesota, however, does not appear to have a bright-line rule barring such claims.  Second, both Wisconsin and Minnesota have sufficient contacts to enable the constitutional application of either state law.

Next, the court weighs the five factors.  Again, for these tort causes of action, the first three factors play a minimal role.  Instead, the last two factors – advancement of the forum's

interests and the application of the better rule of law – are
largely determinative.  As before, Minnesota has a strong interest
in compensating tort victims.  Further, which is the better rule
of law is largely neutral.  Minnesota's interest in permitting
tort victims a route to recovery "has far-reaching effects, such
as avoiding victim reliance on public assistance, restoring
injured parties to good health, paying healthcare providers and
holding parties responsible."  Danielson, 670 N.W.2d at 9.  In
contrast, Wisconsin's rule promotes efficiency.  Therefore, given
Minnesota's strong interest in compensating tort victims, the
court will apply Minnesota law.

### 1.    Negligent Hiring

Negligent hiring claims impose liability for "negligence of
an employer in placing a person with known propensities, or
propensities which should have been discovered by reasonable
investigation, in an employment position in which, because of the
circumstances of employment, it should have been foreseeable that
the hired individual posed a threat of injury to others."  Ponticas
v. K.M.S. Invs., 331 N.W.2d 907, 911 (Minn. 1983).  Negligent
hiring does not "rely on the scope of employment but address[es]
risks created by exposing members of the public to a potentially
dangerous individual."  Yunker v. Honeywell, Inc., 496 N.W.2d 419,
422 (Minn. Ct. App. 1993) (citation omitted).  "Liability for
negligent hiring is determined by the totality of the circumstances

36

surrounding the hiring and whether the employer exercised reasonable care." <u>L.M. ex rel. S.M. v. Karlson</u>, 646 N.W.2d 537, 545 (Minn. Ct. App. 2002) (citation and internal quotation marks omitted).

To start, XPO and KLE argue that Ecklund alone is responsible for hiring Michaels and that they had no involvement in that decision. It appears that plaintiff's argument for bringing this claim against KLE hinges on the argument that KLE is Ecklund's alter ego. As the court as already determined that KLE is not Ecklund's alter ego, the claim against KLE fails.

Further, it seems that plaintiff's argument against XPO is based on its argument either that Ecklund was XPO's agent or that the two companies were engaged in a joint enterprise or venture. Again, because the court rejected those arguments, the claim against XPO on those grounds fails.

The claim against Ecklund, however, is another matter. Ecklund directly hired Michaels and therefore could be responsible for negligently doing so. Ecklund argues that Michaels's job application had no red flags and that it did not have access to any information that may have indicated that Michaels had an unsafe driving record. It also argues that it obtained Michaels's compliance, safety, and accountability score before hiring him. Plaintiff counters, arguing that several of Michaels's answers on his application required additional investigation. Plaintiff also

contends that Ecklund failed to contact Michaels's former employers and thus discover that his work history included poor safety ratings, several incidents suggesting poor judgment, and terminations. Plaintiff also points out that Michaels's criminal history includes numerous offenses that could bear on his fitness to be a driver.

Here, the court finds a sufficient factual dispute to defeat summary judgment. First, the parties dispute what information could have been available to Ecklund prior to hiring Michaels. Some evidence indicates that it could have learned information directly relevant to Michaels's fitness to be a driver from prior employers. Second, a reasonable jury could find that additional investigation was required based on Michaels's job application. Therefore, the court denies Ecklund's motion for summary judgment on this issue.

### 2.    Negligent Retention

Negligent retention arises when an "employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment." Yunker, 496 N.W.2d 419 at 423 (citation and internal quotation marks omitted). Thus, "[t]he difference between negligent hiring and negligent retention focuses on when the employer was on notice

that an employee posed a threat and failed to take steps to insure the safety of third parties."  Id.

Here, Ecklund hired Michaels one day before the accident, and there are no allegations that there were problems with Michaels between the time he was hired and when he left on his first job with Ecklund.  There is also nothing in the record to indicate any problems in that timeframe.  Therefore, a claim of negligent retention is not applicable to these facts, and the court grants summary judgment on this claim.

### 3.   Negligent Supervision

Negligent supervision "is the failure of the employer to exercise ordinary care in supervising the employment relationship, so as to prevent the foreseeable misconduct of an employee from causing harm to other employees or third persons."  M.L. v. Magnuson, 531 N.W.2d 849, 858 (Minn. Ct. App. 1995) (citations and internal quotation marks omitted).  "To make out a successful claim for negligent supervision, the plaintiff must prove (1) the employee's conduct was foreseeable; and (2) the employer failed to exercise ordinary care when supervising the employee."  C.B. ex rel. L.B. v. Evangelical Lutheran Church in Am., 726 N.W.2d 127, 136 (Minn. Ct. App. 2007) (citation and internal quotation marks omitted).

Here, there are no indications that Ecklund failed to supervise Michaels.  Arguably, Michaels's conduct might have been

foreseeable, given his driving and employment record.  Even so, Ecklund appeared to exercise appropriate supervision.  It provided orientation instruction and materials.  It required Michaels to undertake certain basic safety precautions in preparing for and transporting his load.  It maintained communication with Michaels and supervision of his truck.  Even if Ecklund established an unrealistic delivery deadline, those facts do not go to its supervision of Michaels.  Accordingly, the court grants summary judgment on this claim.

**B.   XPO's Selection of Ecklund**

In Count X, plaintiff alleges that XPO was negligent when it selected Ecklund to transport the Beumer Group load.  XPO counters that it performed appropriate due diligence in selecting Ecklund and thus did not breach its duty of care.

The general rule is that an "employer is not liable for the acts or omissions of an independent contractor or its agents." Lakeview Terrace Homeowners Ass'n v. Le Rivage, Inc., 498 N.W.2d 68, 71 (Minn. Ct. App. 1993).  One exception to this rule, however, is when an employer negligently selects, instructs, or supervises the contractors.  Id.  For a negligent selection claim:

> [a]n employer is subject to liability for physical harm
> to third persons caused by his failure to exercise
> reasonable care to employ a competent and careful
> contractor (a) to do work which will involve a risk of
> physical harm unless it is skillfully and carefully
> done, or (b) to perform any duty which the employer owes
> to third persons.

Restatement (Second) of Torts § 411.  Thus, XPO had a duty to use reasonable care when selecting a motor carrier.

Here, there is a factual dispute as to whether XPO was negligent in selecting Ecklund.  XPO primarily argues that Ecklund held a satisfactory safety rating from the U.S. Department of Transportation.  Although XPO acknowledges that it might have an obligation for further investigation if a motor carrier receives a less than satisfactory rating, it argues that it does not have a duty for further investigation if the minimum safety standards are met.  Plaintiff, on the other hand, argues that XPO had a duty to inquire further into Ecklund's operations.

Although case law in Minnesota on negligent selection claims is sparse, there are indications that relying solely on a minimum safety rating may not be enough.  See Soto, 331 F. Supp. 3d at 886-87 (finding that broker's failure to investigate certain aspects of motor carrier's record is sufficient to defeat summary judgment on negligent selection claim).  Further, in general, compliance with a regulation does not necessarily preclude a finding of negligence in cases where a reasonable person would take additional precautions.  See Restatement (Second) of Torts § 288C.

So, the question becomes whether a reasonable person would have taken additional precautions – in the form of further investigation – related to selecting Ecklund as a motor carrier.

41

Here, a reasonable jury could find that additional precautions were necessary. Ecklund's safety rating was over six years old at the time XPO selected it to take on the Beumer Group load. XPO never attempted to investigate or audit Ecklund's financial status, despite evidence that such information is directly tied to a carrier's safety. Johnson Decl. Ex. R. Some evidence suggests that Ecklund's safety management controls were inadequate, leading to a relatively high number of incidents and insurance claims. Id. Ex. M. Viewing these facts in the light most favorable to the plaintiff, a reasonable jury could conclude that XPO failed to exercise reasonable care in selecting Ecklund, and summary judgment is denied.

## IX.  Loss of Consortium

In Count XII, plaintiff brings a loss on consortium claim on her own behalf against all defendants. Consortium "represents reciprocal rights inherent in the marital relationship ..., including such undefined elements as comfort, companionship, and commitment to the needs of each other." Thrill v. Modern Erecting Co., 170 N.W.2d 865, 867-68 (Minn. 1969). A loss of consortium claim is a derivative claim, thus the right to recover derives, through marriage, from an injured spouse's ability to recover from the same defendant. Huffer v. Kozitza, 375 N.W.2d 480, 482 (Minn. 1985). Thus, if the underlying tort claim fails, the loss of

consortium claim fails as well.  Kohler v. Fletcher, 442 N.W.2d 169, 173 (Minn. Ct. App. 1989).

XPO and KLE moved for summary judgment, arguing that none of the underlying tort claims should survive and thus the loss of consortium claim fails as well.  Because at least one tort claim remains against each defendant, however, plaintiff's loss of consortium claim remains.  Accordingly, summary judgment on this issue is denied.

## X.  Punitive Damages

Ecklund moves for summary judgment on plaintiff's punitive damages claims against it.  Under Minnesota law, punitive damages are available if the defendant "'has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others' and 'deliberately proceeds to act in conscious or intentional disregard of' or 'with indifference to the high probability of injury to the rights or safety of others.'"  Kruszka v. Novartis Pharms. Corp., 19 F. Supp. 3d 875, 898 (D. Minn. 2014) (quoting Minn. Stat. § 549.20).  The indifference must be malicious – "an intentional or willful failure to inform or act."  Beniek v. Textron, Inc., 479 N.W.2d 719, 723 (Minn. Ct. App. 1992).  Punitive damages are "an extraordinary remedy to be allowed with caution and within narrow limits."  J.W. ex rel. B.R.W. v. 287 Intermediate Dist., 761 N.W.2d 896, 904 (Minn. Ct. App. 2009) (citation omitted).

Here, plaintiff introduced facts showing that Ecklund accepted a job with an impossible delivery time. Plaintiff also introduced facts that Michaels could be subject to penalties for being late. Finally, plaintiff introduced facts showing that Michaels told officers who responded to the crash site that he was running very late to make his delivery. These facts all suggest that Ecklund created an environment that could cause Michaels to drive recklessly. Given that, Ecklund knew or should have known that there was a high probability of injury to others. Ecklund did not communicate to Michaels that he should disregard the delivery window or that he would not be penalized, thus acting with indifference to the probability of injury.

On the other hand, Ecklund introduced evidence that the delivery window was not time critical. It also introduced evidence that Michaels reported that he did not feel pressure to meet the delivery deadline. This evidence suggests that Ecklund did not act with deliberate disregard to a high probability of injury. Because there are disputed facts related to plaintiff's punitive damages claim, the court denies summary judgment.

## XI.  Indemnity and Defense

Finally, XPO brings a crossclaim, arguing that Ecklund is obligated to defend and indemnify XPO with respect to the claims brought in this case. XPO seeks a court order requiring Ecklund to fulfill these obligations.

Section 10.1 of the MCTA provides that Ecklund:

> shall be liable for, and shall defend, indemnify and
> hold harmless, [XPO] ... from and against, all claims
> ... relating to or arising out of: (a) injury to persons
> (including injury resulting in death) and damage to
> property arising out of or in connection with the
> transportation services performed by [Ecklund} hereunder
> ... [Ecklund] shall not be obligated to indemnify an
> Indemnified Party to the limited extent that the Claim
> directly results from the Negligence or willful
> misconduct of such Indemnified Party.

Johnson Decl. Ex. A, at 8.  Section 10.2 reads:

> If a claim is made against an Indemnified Party alleging
> that the negligent or intentional actions or inactions
> of the Indemnified Party were the sole or a contributing
> cause of the event giving rise to the Claim, [Ecklund]
> shall defend the Indemnified Party, without limitation
> until such time as a final adjudication or settlement
> has been reached.

Id.

To start, the court applies Ohio law because the parties included a clause in the MCTA specifying that it would be construed under Ohio law.  Johnson Decl. Ex. A, at 10; see also Allianz Ins. Co. of Canada v. Sanftleben, 454 F.3d 853, 855 (8th Cir. 2006) ("Under Minnesota law, parties to an insurance contract may agree on the law that will govern the contract.").

Under Ohio law, a motor carrier contract cannot require one party to indemnify, defend, or hold harmless the other party against liability resulting from that party's own negligence or intentional acts or omissions.  Ohio Stat. § 2305.52.  Thus, Section 10.2 of the MCTA is void as against public policy because

45

it requires Ecklund to defend XPO against a claim alleging "that the negligent or intentional actions or inactions of [XPO] were the sole or contributing cause of the event giving rise to the Claim." Johnson Decl. Ex. A, at 8.

Section 10.1, on the other hand, limits Ecklund's defense and indemnity obligations to claims arising out of Ecklund's conduct. Id. ("CARRIER shall not be obligated to indemnify an Indemnified Party to the limited extent that the Claim directly results from the negligence or willful misconduct of such Indemnified Party."). Thus, Section 10.1 does not appear to violate Ohio law. It is a separate question, however, whether Ecklund's obligations under Section 10.1 have been triggered by this lawsuit.

Plaintiff brings multiple claims against XPO in this lawsuit. Many of those claims allege XPO's direct liability. For Count I, plaintiff alleges that XPO aided and abetted tortious conduct. For Counts V and VI, plaintiff alleges that XPO engaged in a joint enterprise and joint venture with the other defendants. Count X alleges that XPO negligently selected Ecklund to deliver the Beumer Group load. These claims all allege direct liability. Count IV, on the other hand, alleges that Ecklund and Michaels acted as XPO's agents – a vicarious liability claim. Count VIII likely also alleges a vicarious liability cause of action - that Ecklund, and by extension XPO, negligently hired, retained, and supervised Michaels.

Because many of plaintiff's claims alleged direct liability based on XPO's own actions, Section 10.1 had likely not been triggered to this point.  Further, legal and factual disputes remain.  Therefore, the court finds that a determination on Ecklund's duty to defend and indemnify would be premature.

## XII. Breach of Contract

XPO also seeks a court order finding that Ecklund breached the MCTA by failing to provide it with insurance coverage.  It appears that XPO requests a finding that Ecklund breached the MCTA and an order requiring Ecklund to defend and indemnify it.

The MCTA states:

9.1 <u>Insurance Policies</u>.  CARRIER shall procure and maintain in force, at its own expense, throughout the term of this Agreement, all health, worker's compensation, cargo and liability insurance to at least the limits required by Applicable Law and industry standards in locations where CARRIER provides transportation services. Carrier additionally agrees to maintain the following insurance coverage:

(a)  Commercial Liability Insurance in the amount of $1,000,000 USD per occurrence (or the Canadian equivalent);

(b)  Automobile Liability Insurance in amounts not less than $1,000,000 USD (or the Canadian Equivalent) per accident or in accordance with the requirements of 49 C.F.R. Part 387 (whichever requirement is greater), such insurance shall include MCS-90 endorsement and broadened pollution liability coverage endorsement;

Ecklund purchased the required insurance with a blanket additional insured endorsement.  Moline Decl. Ex. 4.  After

47

plaintiff initiated this lawsuit, XPO sent a tender letter to Ecklund's insurance company, requesting insurance coverage pursuant to the MCTA. Hansmeier Decl. Ex. 12. The insurance company, however, rejected the tender and told XPO that it was not covered under the policy due to the Total Brokerage Exclusion provision, which excluded coverage to brokers.[14] Id. Ex. 13. It does not appear that XPO has challenged the insurance company's denial of coverage.

Again, the court finds that summary judgment on this issue would be premature. At its core, XPO's motion would require the court to find that Ecklund's insurance company properly denied XPO's tender. That is, the court would need to find that XPO truly was not an additional insured under Ecklund's policy. The court, however, does not have sufficient information before it at this time to make a determination on this issue.

---

[14] The Total Brokerage Exclusion provision provides that, "This insurance does not apply to liability of any insured while acting as a Broker, Freight Forwarder, Agent, or Third-party Logistics Provider, or to any other arrangement by which freight is hauled by a driver not leased or employed by any insured and hauled under another Trucker of Motor Carrier's operating authority." Hansmeier Decl. Ex. 13, at 2. Thus, the insurance company found that XPO was not covered under the policy because it acted as a broker. Id.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERERD** that:

1.    XPO's motion for summary judgment [ECF No. 202] is granted in part;

2.    KLE's motion for summary judgment [ECF No. 213] is granted in part; and

3.    Ecklund's motion for partial summary judgment [ECF No. 218] is granted in part as set forth above.


Dated: August 16, 2022

<div style="margin-left: 50%;">

s/David S. Doty
_____
David S. Doty, Judge
United States District Court

</div>

49